404 F.2d 1
 C. H. CODDING & SONS, a Partnership Composed of Charles H. Codding, Sr., Charles H. Codding, Jr., and Donald K. Codding, Appellant,
v.
ARMOUR AND COMPANY, a Delaware Corporation, Appellee.
 No. 9342.
 United States Court of Appeals Tenth Circuit.
 December 5, 1968.
 
 COPYRIGHT MATERIAL OMITTED David Hall, Tulsa, Okl., and Robert P. Kelly, Pawhuska, Okl. (Stanley B. Block, Chicago, Ill., with them on the brief), for appellant.
 Horace D. Ballaine, Tulsa, Okl. (George E. Leonard with him on the brief), for appellee.
 Before MURRAH, Chief Judge, and BREITENSTEIN and HILL, Circuit Judges.
 MURRAH, Chief Judge.
 
 
 1
 This diversity action was brought in the district court by Armour and Co. for an accounting of the proceeds from the liquidation of a joint venture between Armour and C. H. Codding & Sons. Codding answered and counterclaimed for loss of anticipated profits for breach of the joint venture agreement and in violation of the antitrust laws. By agreement all issues but the counterclaim were submitted to a Special Master. The trial court adopted the Master's report as its findings of fact and directed a jury verdict for Armour on Codding's counterclaim. Codding appeals alleging numerous errors in the Master's report and challenging the judgment on the directed verdict.
 
 
 2
 The purpose of the joint venture was to produce beef cattle with carcasses of higher yield through the use of progeny tested sires with production tested commercial beef herds. This process involved the breeding of commercial cows by artificial insemination from selected bulls known to be genetically superior.
 
 
 3
 Under the 6 year agreement Codding was to furnish the use of its ranch and all facilities along with 750 cows. Codding was to manage the venture, keep the books, and receive a guaranteed minimum of $50,000 per year along with 50% of each year's heifer calf crop from the joint venture cows and all permanent improvements to the ranch at the end of the venture. Armour was to collect and process all semen and in a general way underwrite the venture financially. From the very start the enterprise was financially unsuccessful with net losses occurring each year, and therein lie the seeds of this lawsuit, details of which will be discussed where relevant.
 
 
 4
 The issues before the Special Master involved claims by Codding for certain expenses incurred by it which it felt were rightly joint venture expenses and claims by Armour on behalf of the joint venture and itself challenging expenses of Codding.
 
 
 5
 * THE MASTER'S REPORT
 
 
 6
 Codding initially attacks the trial court's judgment by asserting that the findings and report of the Special Master, which were adopted by the trial court as its own, were not in accord with Rule 52, Federal Rules of Civil Procedure for lack of the required specificity. From our review of the Master's report we are convinced that, except as hereinafter noted, the findings were entirely sufficient to support the ultimate conclusions of fact and law and it is, of course, elementary that the findings of fact and conclusions of law when sufficiently specific are presumptively correct and will not be set aside by this Court unless clearly erroneous. Transportation Insurance Co. v. Hamilton, 10th Cir., 316 F.2d 294; and United States Fidelity and Guaranty Co. v. State of Oklahoma, 10th Cir., 383 F.2d 417. We shall now consider the points raised against them.
 
 
 7
 But before we do so let us note the nature of a joint venture relationship. It is, of course, fiduciary in character — each adventurer owing the other and the joint venture the highest degree of fidelity, loyalty and fairness in their mutual dealings. Rocket v. Ford, 326 P.2d 787 (Okl.1958). As then Judge Cordozo stated: "[N]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Meinhard v. Salmond, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928). Cf. Opco, Inc. v. Scott, 10th Cir., 321 F.2d 471 and Homestake Min. Co. v. Mid-Continent Exploration Co., 10th Cir., 282 F.2d 787. And when, as here, one party is given managerial authority requiring affirmative consent of the other party only in specified cases this duty of openness and full disclosure is accentuated. Bosworth v. Eason Oil Co., 202 Okl. 359, 213 P.2d 548 (1949). We now discuss the challenges made by Codding in light of these basic principles.
 
 THE OLSEN LEASE RENTAL
 
 8
 The Master's report allowed Codding the $14,235.58 rental paid for the Olsen lease. Codding contends that while this is correct it was never actually given credit for this amount either in the recapitulation of the accounting or in the judgment. In its reply Armour refers us to certain portions of the record to show that this amount was included in another figure for which Codding did receive credit. Our review of the record and report leaves the issue in doubt. While Codding may have received credit for this amount we cannot identify it in the recapitulation and neither Armour's proffered explanation nor the court's findings of fact are of any assistance. We consequently remand this portion of the case for redetermination and more specific findings.
 
 CODDING'S CLAIM FOR THE PROCEEDS OF 115 BULLS
 
 9
 Admittedly Codding appropriated 115 joint venture bulls for its own use. Later Codding sold 40 of these bulls for $19,100. In the accounting the Master allowed Codding to keep the remaining 75 bulls and the $19,100 but charged Codding $12,995 as and for the 115 bulls.[1] By some legerdemain we're now urged to allow Codding $8,475 of this amount. In short, it wants the bulls and the money. The assertion of such a claim in light of the facts taxes our credulity and is unworthy of comment.
 
 MISCELLANEOUS $29,553.13
 
 10
 A further claim by Codding denied by the Master was for miscellaneous expenses, i. e. commissions, maintenance, and repairs. These expenditures were made by Codding from its own bank account. Codding testified he felt these were proper joint venture expenses. With the exception of $1,500 Codding did not specifically notify Armour of any of these expenditures nor record them on the joint venture's books. While there is evidence that Armour's employees had knowledge of the activity there can be no estoppel as Codding made no attempt to charge these expenses to the joint venture thus imposing no duty on Armour to challenge them. We feel the Master was justified in denying this claim in view of the fiduciary relationship between Armour and Codding. Knowledge that Armour, under the terms of the joint venture agreement, would eventually bear the costs of these repairs imposed a duty on Codding as manager of the joint venture to keep Armour informed as to present and contemplated expenditures. While Armour's consent may not have been required for certain expenditures good faith required full disclosure at all times. Codding's expressed intent to charge in futuro is unpersuasive.
 
 THE DRUMMOND LEASE RENTAL
 
 11
 Codding admittedly acquired this lease in the name of C. H. Codding & Sons, a partnership, for the purpose of using it for its own cattle but asserts that this intent was frustrated by Armour's refusal to allow Codding to separate the Codding cows from the joint venture herd and that joint venture cows actually used this lease during 1964. Thus, it argues that in light of the authority granted it by the joint venture agreement to obtain leases and be reimbursed this expense should have been allowed. The Master apparently was of the opinion that while some of the joint venture cattle were grazed on this lease in 1964 the pasture was not needful to the joint enterprise and that under the peculiar circumstances Codding was not entitled to reimbursement. From our review of the record we cannot say that the Master's findings are clearly erroneous.
 
 
 12
 THE CLAIM FOR FITTING, FEEDING, AND GROOMING REGISTERED HERD
 
 
 13
 Codding argues here that the Master found that only the expenses for fitting and grooming were outside the scope of the joint venture and not the expenses for feeding. This overlooks the Master's finding that "Codding[s] should not be allowed their expense for the fitting, feeding and grooming of the bulls as [joint venture] expense." The Master based this conclusion on his previous finding that the showing of the registered herd was a "venture of their [Codding] own". As this is not clearly erroneous but rather appears eminently correct we must reject Appellant's argument.
 
 THE ESTRUS LABORATORY CLAIM
 
 14
 Codding next claims $64,091 for the failure of Armour to allow the joint venture to build a laboratory for the Controlled Estrus Program. In 1959 the original joint venture agreement was modified to provide, inter alia, for the joint venture "to build * * * a suitable laboratory and shelter facilities for conducting a Controlled Estrus Program * * *" By letter agreement the joint venture agreed with Armour to build the laboratory for an agreed compensation. The shelter was built and the initial experiments carried out. Subsequently it clearly appeared that no drugs were available at that time to enable the joint venture to control the estrus cycle of range cattle. Without being able to control this cycle the laboratory was no longer needed. Codding argues that the joint venture agreement committed Armour to build a laboratory and that this was the consideration for Codding to agree to carry on the Controlled Estrus Program. The argument overlooks the nature of a joint venture and the fiduciary duty owed by the manager to the venture and the co-adventurer. Codding, as manager, cannot be heard to insist that the joint venture expend funds to accomplish no other purpose than Codding's financial benefit. To allow this would be to allow the worst kind of bad faith by one owing in law the highest degree of fidelity.
 
 THE BULL DEPLETION CLAIM
 
 15
 Early in the venture a need arose for "catch bulls" to breed joint venture cows. Catch bulls are bulls turned in with the cows after the cows have been bred artificially to assure a calf. Codding owned 31 bulls separately and used them for this purpose. Initially there was no agreement between Codding and Armour for any payment for these bulls or their use. Later, agreement was reached whereby Codding consented to the use of these bulls for artificial breeding without charge (except a named bull not here in controversy). The Master denied the claim, apparently on the ground that as there was no agreement for payment and Codding used the bulls on its own volition as manager of the joint venture the maintenance of the bulls was sufficient payment. We feel that as manager of the joint venture Codding owed a duty to the joint venture and Armour to disclose that it expected payment. Without such disclosure we cannot say the Master's report in that respect was clearly erroneous.
 
 THE CALF CROP LOSS CLAIM
 
 16
 The Master's denial of this claim is erroneous. The original joint venture agreement provided that "[D]eath losses and reproductive losses in excess of a total of 2 per cent of the number of cows over two years old at the beginning of each year shall be the liability of [the joint venture]." The testimony on this issue was virtually in direct conflict as to the meaning of "reproductive losses". Codding argues that at the time of entering into the joint venture the parties intended that the joint venture protect Codding from calf crop losses in excess of two per cent. Codding's calf crop the year prior to the joint venture was 85% of its total cow inventory. It thus argues that when the calf crops fell below 83% (as occurred throughout the term of the joint venture) they were entitled to compensation especially in light of the Master's finding that the "calf crop loss on this claim was due to the artificial insemination program of [the joint venture] and not to injury or disease to the cows * * *" Armour argues that the language makes no mention of normal calf crops and actually means loss of reproductive ability in the 2 year old cows which under the terms of the contract would belong to Codding at the end of the joint venture. While the testimony is conflicting we think the Master erred in denying the claim in light of the testimony of Dr. Hill — witness for Codding and Armour's representative at the beginning of the joint venture. In answer to the Master's question on the meaning of the term "reproductive losses" Dr. Hill responded that it meant "the difference between the actual calf crop and the expected calf crop, minus whatever liability the owners claim," i. e. the 15% asserted by Codding to be normal. It must be noted that the validity of this claim does not depend so much on findings of fact as on construction of language in the agreement according to the ascertained intention of the parties when the contract was made. Kelso v. Kelso, 10th Cir., 225 F.2d 918. The construction of this language by the Master and Trial Judge is, of course, entitled to great respect. But when the testimony of the two representatives for the two joint adventurers (Dr. Hill for Armour and Don Codding for Codding) agree as to the original intent, we think it must be taken as true barring damaging testimony to the contrary or serious impeachment of the witness. The Master made no comment on this testimony and we have been referred to no impeaching facts in the record. Without such the Master's finding is clearly erroneous and must be reversed.
 
 JOINT VENTURE NOTES OWING TO ARMOUR
 
 17
 During the life of the joint venture Armour loaned the venture a total of $1,320,015. $234,139 of this was repaid in cash and the Master further reduced the outstanding balance by two amounts of $23,562 and $15,925 each. Thus Armour claims from the joint venture a net $1,046,388 which was allowed by the Master. Codding attacks this award on the ground that the true amount owing is only $88,811.45 — the difference representing joint venture losses during the enterprise. According to the evidence, and as found by the Master, Armour, at the end of each year, reduced its notes receivable due from the joint venture by the amount of the joint venture's net loss and also made a corresponding reduction in the notes payable on the joint venture's books. Codding was fully aware of these transactions. Armour now contends that these were mere accounting entries in the nature of bad debt markoff by Armour allowing it to take the losses for tax purposes as they occurred. The original joint venture agreement provided that: "[I]n the event the net income of [the joint venture] is less than $50,000 per year, Armour shall pay each year to Codding the difference between the net income and $50,000." Armour thus argues that while they had guaranteed Codding a minimum income of $50,000 they did not agree to pay the joint venture losses. The original joint venture agreement was executed October 13, 1958. On November 4, 1958, Armour's attorney, E. G. Robbins, wrote Codding "spelling out the three areas of possible ambiguity in the [joint venture] contract and our [i. e. Armour's] intent therewith." In relation to the section of the joint venture agreement immediately above Mr. Robbins stated: "[I]f, on the other hand, the joint venture actually had a loss year, Armour would be obligated to pay the loss to the venture and an additional $50,000 * * * to the Codding partnership as its share of the profits from the enterprise." Thereafter, Armour each year reduced its own receivables and the ventures payables as detailed above. As a co-adventurer Armour also owed Codding a fiduciary duty of open dealing and fairness. If its actual intent was as now claimed it was kept well concealed. The "clarifying letter" from Robbins and Armour's subsequent treatment of the losses clearly and reasonably led Codding to believe Armour was paying the joint venture's losses. Armour's actions conforming to its letter of intentions is conclusive in light of the fiduciary relationship. To attempt to reduce the venture's net worth by increasing its payables is a pro tanto shift of loss to Codding in spite of a clear intent that Codding should not lose in the venture. The Master's allowance seems to be based on the equities of the case. But as inequitable as it may seem the contract is clear and unambiguous — made so by the "clarifying language" of Armour's own attorney. Under the plain language of the contract there is no basis for the Master's allowance of Armour's claim.
 
 
 18
 THE CLAIM BY ARMOUR RELATING TO MAINTENANCE OF REGISTERED HEIFERS
 
 
 19
 On this claim the Master held that Codding intended these registered heifers to be its separate project and that they purchased the herd without knowledge of Armour yet maintained them at joint venture expense. Codding denies this but offered no evidence to the contrary and neglects to point out wherein the Master's finding is clearly erroneous. The amount allowed Armour is, however, difficult to understand. The Master does not attempt to show how he arrived at the $45,507.54 figure. While the finding is presumptively correct it is without sufficient detail to enable us to understand the factual basis for it. Armour's attempted explanation is unconvincing and we must remand for further findings as to the basis for the amount of this claim.
 
 II
 DIRECTED VERDICT ON THE COUNTERCLAIM
 
 20
 We come now to consider the judgment of the trial court sustaining the motion for a directed verdict on the grounds that the proof of loss of profits was entirely too speculative to go to the jury. This claim involves Codding's share of the profits the joint venture would have realized had it been allowed to sell semen on the market.
 
 
 21
 The rule for the granting of a directed verdict has been often repeated. Its essence requires that before a motion for a directed verdict shall be sustained the evidence must be "all one way or so overwhelmingly preponderant in favor of the movant that the trial court in the exercise of its sound discretion would be required to set the verdict aside." Chicago, Rock Island and Pacific R. R. v. Howell, 10th Cir., 401 F.2d 752. See also Texaco v. Pruitt, 10th Cir., 396 F.2d 237; Union Pacific Railroad Co. v. Lumbert, 10th Cir., 401 F.2d 699; and Lumbermens Mutual Casualty Co. v. Rhodes, 10th Cir., 403 F.2d 2.
 
 
 22
 Crucial to our review of the directed verdict is the determination of whether, under the joint venture contract, Armour had a duty to collect, process and supply semen for market free of charge to the joint venture. Codding necessarily so contends. Obviously if there was no such duty, the directed verdict must be sustained.
 
 
 23
 The "whereas" preamble to the joint venture contract contemplated the production and use of superior grade beef cattle through the development and use of progeny tested sires to the mutual benefit of both parties. Armour was to reap the fruits of its bargain by the production and sale of its beef on the market. It hoped to improve its herds by artificial insemination with semen developed by and purchased from the joint venture. Codding was to reap its reward for use of its property and efforts by a guaranteed minimum return, share of profits, 50% of the joint venture heifer calf crop each year, and retention of all permanent improvements to its ranch. There was no mention in the preamble of production and sale of semen on the open market. The body of the agreement did require Armour to pay for minimum amounts of semen, whether produced and used or not, required it to purchase from the joint venture all its needs for its beef cattle improvement program, and granted it an option on all semen in excess of these minimums. Armour was also "responsible for the collection and processing of all semen" and "[A]ny semen produced and not sold to Armour [was to] be sold by [the joint venture]." But there was no express obligation for Armour to produce any amount — especially for market. Thus the only duty Armour could have incurred to collect, process and supply semen to the joint venture for market must be implied from the contract as construed by the conduct of the parties. Boswell v. Chapel, 10th Cir., 298 F.2d 502; Restatement of Contracts § 235(e); and Williston on Contracts, Third Edition, Section 623.
 
 
 24
 This brings into play the rule which imposes upon each party to any contract the duty of good faith performance to the end that neither party shall be deprived of the fruits of its bargain. Ryder Truck Rental, Inc. v. Central Packing Co., Inc., 10th Cir., 341 F. 2d 321; Williston on Contracts, Third Edition, Section 670, p. 159. Certainly, the interpretation of a contract is usually a question for the court and not one for the jury unless controverted extrinsic evidence is essential to determine the intention of the parties. United States v. Nickel, 10th Cir., 243 F.2d 924; Tenneco Oil Co. v. Gaffney, 10th Cir., 369 F.2d 306; Socony Mobil Oil Co. v. Humble Oil & Ref. Co., 10th Cir., 387 F. 2d 155; and United States v. Continental Oil Co., 10th Cir., 364 F.2d 516. But where, as here, the controversy is not over facts but over the legal effect to be given uncontroverted facts the issue is properly one for the court.
 
 
 25
 In retrospect its seems fair to say that the contract itself contemplated the contingency of semen sales to third persons after Armour's requirements were fulfilled. This much is manifest by Armour's acknowledgement that the "original concept * * * of our joint venture, was the development of a market for semen sales from performance and progeny tested bulls."
 
 
 26
 Several times during the life of the joint venture Codding proposed that the venture enter the semen sales market and, at least once, offered to buy semen from the joint venture for sale on the market. These proposals were apparently considered and declined by Armour on the ground that "[Armour and not the joint venture was] the marketing agent [ ] for semen produced from the performance and progeny tested sires * *". It is pointed out by Codding that while declining to allow the joint venture to enter this field, Armour, in 1963-64, was negotiating with semen buyers and in fact sold some small amounts of semen purchased by Armour from the joint venture. But the record is significantly void of any demand by Codding that Armour supply semen for sale on the market. Instead, the record shows that, on at least one occasion, Codding expressly recognized Armour's "right and privilege" to refuse to participate through the joint venture in the sale of surplus semen.[2]
 
 
 27
 The contemplation of semen sales to third persons and provision for it in the agreement do not ipso facto obligate either party to bring about the contingency. While contemplation may, indeed, be indicative, it is not conclusive of the bargain. The evidence is clear that they thought about it, talked about it, and provided for it. But these negotiations and discussions are legally insufficient to raise the contingency to the level of a positive duty. This is especially so in view of the fact that neither party recognized, acknowledged, or asserted the duty during the life of the contract. We conclude, therefore, that Armour's duty of good faith performance imposed no duty to supply semen for market. So deciding, we do not reach the issue concerning the speculative nature of the damages.
 
 
 28
 The judgment on the counterclaim is sustained and the judgment on the Master's Report is remanded for further proceedings in accord with the views herein expressed.
 
 
 
 Notes:
 
 
 [1]
 The Master charged Codding for 115 bulls at a total of $12,995. In this appeal Codding only claims $8,475 representing the proceeds to the joint venture from Codding for the 75 bulls not originally sold by Codding
 
 
 [2]
 The so-called "$100,000 offer" from Codding set out that:
 "Armour and Company has indicated disapproval to participate through the Joint Venture in any of these related endeavors [including the sale of surplus semen].
 "It is most certainly not our intention to pass judgment or cast reflection in any way upon Armour and Company. It is indeed their right and privilege to make such a decision." [emphasis added]