Kenneth E. BLACK et al., the Trustees of C. I. Mortgage Group, or their respective successors in office as Trustees, Plaintiffs-Appellees,

v.

Louis G. O'HAVER and Betty K. O'Haver, Defendants-Appellants in Nos. 76–1201 & 77–1195, Defendants-Appellees in No. 76–1202.

NOAH BUILDERS, INC., Defendant-Third-Party Plaintiff-Appellant in No. 76–1202, Defendant-Third-Party Plaintiff-Appellee in Nos. 76–1201 & 77–1195,

and

Curtis G. Newman (Third-Party Plaintiff) et al., Defendants-Appellees,

v.

STILLWATER NATIONAL BANK AND TRUST COMPANY, Third-Party Defendant-Appellee.

Nos. 76–1201, 76–1202 and 77–1195.

United States Court of Appeals, Tenth Circuit.

Submitted Sept. 27, 1977.

Decided Nov. 23, 1977.

James F. Davis, Oklahoma City, Okl. (S. Paul Hammons, Oklahoma City, Okl., on the brief), of Andrews, Mosburg, Davis, Elam, Legg & Bixler, Inc., Oklahoma City, Okl., for plaintiffs-appellees, Black, et al.

Winfrey D. Houston of Fitzgerald, Houston & Worthington, Stillwater, Okl., for O'Havers.

Robert H. Alexander, Jr., Oklahoma City, Okl. (Val R. Miller, Oklahoma City, Okl., on the brief), of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., for Noah Builders, Inc.

W. Keith Thomas of Thomas, Hert & Anderson, Stillwater, Okl., for Stillwater National Bank and Trust Co.

Ronald D. Fulkerson, Oklahoma City, Okl., on the brief, for appellee, Milford W. Parker, d/b/a Parker Drywall Co.

Mitchell D. O'Donnell, Tulsa, Okl., on the brief, for appellee, Concrete Specialties of Tulsa, Inc.

Carroll F. Pope, Stillwater, Okl., on the brief, for appellee, Roy T. Hoke Lumber Company, Inc.

R. L. Hert, Jr., of Thomas, Hert & Anderson, Stillwater, Okl., on the brief, for appellees, the Quapaw Co. and Kerns Const., Inc.

Max E. Sater, Stillwater, Okl., on the brief, for appellee, Sam Short, d/b/a Short's Floor Covering.

Frank W. Davis, Guthrie, Okl., on the brief, for appellee, Turnkey Industries, Inc.

Before McWILLIAMS, BREITENSTEIN and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

These consolidated appeals arise from a financial collapse involving a residential construction project. At issue is the liability of a construction company officer, the company's bank, and two guarantors of the company's obligations. Jurisdiction is based entirely upon diversity.

The facts as stated below were included in the special master's findings, as adopted by the district court:

In May of 1971, appellant O'Haver, together with two men named Head and Newman, organized appellant Noah Builders, Inc. (Noah). O'Haver, Head and Newman were directors, officers and shareholders of Noah. Noah was created solely for the purpose of building an apartment complex in Stillwater, Oklahoma. The project was dubbed "The Hacienda Apartments."

On July 7, 1971, Noah executed three instruments in favor of the trustees of C.I. Mortgage Group (CI), appellee. Under the Building Loan Note (Note), Noah borrowed money from CI to build the Hacienda project. The other two instruments were a Real Estate Mortgage (Mortgage) securing the Note, and a Building Loan Agreement (Agreement). Both the Agreement and the Mortgage contained terms, conditions and covenants relating to the loan and the construction of the Hacienda project.

In Paragraph Eleven (11)(d) of the Agreement, Noah covenanted that it would:

. . . cause the construction of the building and improvements to be prosecuted with diligence and continuity and complete the same, in accordance with the final plans and specifications . . . free and clear of liens or claims for liens for materials supplied and for labor or services performed in connection with the construction of the building and improvements . . .

Paragraph Nineteen (19) of the Mortgage provided that:

The Mortgagee [CI] may employ counsel for advice or other legal service at the Mortgagee's discretion in connection with any dispute as to the obligations of the Mortgagor [Noah] hereunder and under the Note and Building Loan Agreement hereby secured, or as to the lien of this instrument, or in any litigation to which the Mortgagee may be made a party on account of this lien or which may affect the title to the Premises or the validity of

the indebtedness hereby secured, and any reasonable attorneys' fees so incurred shall be added to and be part of the debt hereby secured . . .

In their individual capacities, and in order to induce CI to make the loan to Noah as approved, O'Haver, Head and Newman, together with appellant Mrs. O'Haver and Mrs. Head, executed a Guaranty of Completion (Guaranty) in favor of CI. The second and third paragraphs of the Guaranty are central to our determination:

2. The undersigned unconditionally guarantee to the Trust [CI] the due performance of all the Borrower's [Noah's] obligations under the Building Loan Agreement and the Mortgage . . . including the Borrower's obligation for the payment of all legal and other costs and expenses paid or incurred by the Trust in the enforcement thereof against the Borrower or the undersigned.

3. The liability of the undersigned under this Guaranty shall be unaffected by (i) any amendment or modification of the provisions of the Building Loan Agreement, Mortgage or any other instruments made to or with the Trust by the Borrower . . . or (iii) the release of the Borrower from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the said instruments by operation of law . . . Each of the undersigned . . agrees that any payments required to be made by them hereunder shall become due on demand in accordance with the terms hereof immediately upon the happening of a default under either the Building Loan Agreement or the Mortgage and each of them expressly waives and relinquishes all rights and remedies accorded by applicable law to guarantors.

Noah's board of directors authorized O'Haver and Head to engage in banking transactions for and on behalf of Noah. During July, 1971, O'Haver or Head, or both, opened two accounts at the Stillwater National Bank and Trust Company (Bank). The first account was originally in Noah's name, but the account name was soon changed to read "Head Construction, Hacienda Apts. Project." The second account, opened later in the month, was and remained in Noah's name.

Beginning in July, 1971, and continuing for almost one year, CI advanced loan money to the Bank with instructions that it be deposited to Noah's account. O'Haver and Head, in their capacities as Noah officers, instructed the Bank to deposit each of the advances received from CI to the Head Construction account, and the Bank did so. The advances from CI were, in that manner, diverted from the Noah account.

Construction of the Hacienda project was begun in July, 1971. From then until early July, 1972, O'Haver and Head were in complete active control of Noah and the project. From early July, 1972, through most of August, 1972, O'Haver, Head and Newman each exercised some control over Noah. From August 24, 1972 and thereafter, Newman was in complete active control of Noah.

After June 7, 1972, CI stopped advancing loan money because construction of the Hacienda project had not progressed quickly enough. CI and Noah, acting through Newman, amended the Building Loan Agreement. CI waived one clause in the Agreement and made additional advancements to Noah. In consideration of these acts, Noah paid CI a $12,000 fee.

Newman began an investigation of the application of funds previously advanced by CI and deposited, as we have seen, to the wrong account. Discussions among Newman, O'Haver and Head led to a written agreement in which O'Haver and Head acknowledged their debt to Noah for amounts diverted from the Noah account. O'Haver and Head executed promissory notes in favor of Noah. They also assigned their Noah stock interests and incident voting rights to Newman pending satisfaction of the debt. O'Haver sought to pay off his debt by discharging or assuming certain lienable claims incurred by Noah in constructing the Hacienda project.

CI made its last advance on the Noah loan on October 20, 1972. The Hacienda

project was still unfinished when CI instituted foreclosure proceedings on March 12, 1973. CI in a separate cause of action sued the O'Havers, the Heads and Newman on the Guarantee for the amount required to complete construction of the Hacienda project as contemplated in the Agreement. Several unpaid mechanics and materialmen filed liens against the property. Noah and Newman filed cross-claims against O'Haver and Head, as well as third-party complaints against the Bank. A receiver chosen by CI took control of the Hacienda project and completed its construction.

The district court referred the case to a special master for hearing. The master's report setting forth findings of fact and conclusions of law was adopted by the court with few modifications. The district court's Journal Entry of Judgment provides, *inter alia*:

1. That the Mortgage be foreclosed and the Hacienda project sold to satisfy the judgments of CI and the mechanics and materialmen against Noah;

2. That CI recover judgments against the O'Havers on the Guaranty for:

    (a) the costs of completing the Hacienda project;

    (b) the costs and expenses of CI's receiver;

    (c) the sum of judgments in favor of mechanics and materialmen, and attorneys' fees allowed in connection with those judgments;

    (d) the amount allowed as CI's attorneys' fees,

such judgments to be enforceable to the extent that proceeds from the sale of the Hacienda project are inadequate to reimburse CI for such amounts;

3. That the mechanics and materialmen recover judgments against O'Haver as a "managing officer" of Noah, for the amount of their lienable claims and attorneys' fees, such judgments to be enforceable to the extent that proceeds from the sale of the Hacienda project are insufficient to satisfy the judgments;

4. That Noah recover judgment from O'Haver for the amount unpaid on O'Haver's promissory note in favor of Noah;

5. That Noah take nothing by its cross-claim against O'Haver for actual and exemplary damages; and

6. That Noah take nothing by its third party complaint against the Bank.

Appeals have been taken from the judgments as set forth in 2. through 6. hereinabove. During the pendency of these appeals, the United States Marshal sold the Hacienda project at foreclosure sale as ordered by the district court. The sale proceeds were not sufficient to satisfy the judgments. CI, however, did not move for or obtain a deficiency judgment against Noah within ninety (90) days of the foreclosure sale as provided by Title 12, Okl.Stat. 1971, § 686.[1] The O'Havers thereupon filed

---

1. 12 O.S. § 686 states:

In actions to enforce a mortgage, deed of trust, or other lien or charge, a personal judgment or judgments shall be rendered for the amount or amounts due as well to the plaintiff or other parties to the action having liens upon the mortgaged premises by mortgage or otherwise, with interest thereon, and sale of the property charged and application of the proceeds . . . Notwithstanding the above provisions no judgment shall be enforced for any residue of the debt remaining unsatisfied as prescribed by this Act after the mortgaged property shall have been sold, except as herein provided. Simultaneously with the making of a motion for an order confirming the sale or in any event within ninety days after the date of the sale, the party to whom such residue shall be owing may make a motion in the action for

leave to enter a deficiency judgment upon notice to the party against whom such judgment is sought or the attorney who shall have appeared for such party in such action. Such notice shall be served personally or in such other manner as the court may direct. Upon such motion the court, whether or not the respondent appears, shall determine, upon affidavit or otherwise as it shall direct, the fair and reasonable market value of the mortgaged premises as of the date of sale or such nearest earlier date as there shall have been any market value thereof and shall make an order directing the entry of a deficiency judgment. Such deficiency judgment shall be for an amount equal to the sum of the amount owing by the party liable as determined by the judgment with interest, plus costs and disbursements of the action plus the amount owing on all prior liens and encumbrances with interest,

a motion for relief from judgment under Fed.R.Civ.P., rule 60(b)(5), 28 U.S.C.A.[2] on grounds that the proceeds of the foreclosure sale are by the terms of 12 Okl.Stat. § 686, deemed to have satisfied CI's judgment against Noah, rendering CI's judgments against the guarantors O'Haver unenforceable. The district court ordered that the motion be denied. The O'Havers appeal from that order.

## I.

We will first consider the question of O'Haver's liability insofar as it resulted from his status as a Noah officer.

The district court adopted the master's finding that under Section 152(2) of Title 42, Oklahoma Statutes 1971,[3] all funds advanced by CI to Noah's account constituted "trust funds" for the payment of valid lienable claims in connection with the construction of the Hacienda project. Section 153 of Title 42[4] provides that a corporation's "managing officers" are liable to lienholders to the extent that the trust funds are applied to purposes other than payment of lienable claims. The master found that during the time when O'Haver was a managing officer of Noah, an amount greater than the sum of mechanics' and materialmen's liens established in this action was applied to purposes other than payment of lienable claims. O'Haver, therefore, was found liable as a constructive trustee for the full amount of the mechanics' and materialmen's lienable claims.

O'Haver's argument in opposition to the trial court's finding is two-fold. First, he argues that he was not a managing officer of Noah, but that Head was the general contractor and wrote most of the checks for the construction. Second, O'Haver contends that he cannot be held liable for lienable claims that become due and owing after the date when, as the master found, O'Haver ceased to be a managing officer.

We know of no Oklahoma decision which construes the term "managing officer" as used in 42 O.S. § 153. The views of the resident federal district judge therefore carry extraordinary force on these appeals. *United States v. Hunt*, 513 F.2d 129 (10th Cir. 1975); *United States v. Wyoming National Bank of Casper*, 505 F.2d 1064 (10th Cir. 1974). Moreover, we will not disturb the trial court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P., rule 52, 28 U.S.C.A.; *Volis v. Puritan Life Ins. Co.*, 548 F.2d 895 (10th Cir. 1977).

■ O'Haver admits that he was a Noah officer during most of the construction, bought materials, dealt with subcontractors for a major portion of the construction work, and wrote checks on Noah's account in payment of these subcontractors.

---

less the market value as determined by the court or the sale price of the property whichever shall be the higher. *If no motion for a deficiency judgment shall be made as herein prescribed the proceeds of the sale regardless of amount shall be deemed to be in full satisfaction of the mortgage debt and no right to recover any deficiency in any action or proceeding shall exist.* (Footnote omitted.) (Emphasis supplied.)

2. Rule 60(b), Fed.R.Civ.P., states:

*Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.* On motion and upon such terms as is just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application . . . .

3. 42 O.S. § 152(2) states:

The monies received under any mortgage given for the purpose of construction or remodeling any structure shall upon receipt by the mortgagor be held as trust funds for the payment of all valid lienable claims due and owing or to become due and owing by such mortgagor by reason of such building or remodeling contract.

4. 42 O.S. § 153 states:

(1) Such trust funds shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other purpose until all lienable claims due and owing or to become due and owing shall have been paid. (2) If the party receiving any money under Section 152 shall be a corporation, such corporation and its managing officers shall be liable for the proper application of such trust funds.

O'Haver occasionally signed payroll checks, and made bank loans to finance the construction between interim loan payments. [Nos. 76–1201 and 76–1202, Brief of Appellants, Louis G. O'Haver and Betty K. O'Haver, pp. 12–13.] Unlike defendant Ruby in *Nuclear Corporation of America v. Hale*, 355 F.Supp. 193 (N.D.Texas 1973), affirmed 479 F.2d 1045, 5 Cir., cited by O'Haver, O'Haver exercised his power to disburse corporate funds and took an active role in the operations of his corporation, participating in Noah's day to day affairs. The trial court adopted the master's finding that O'Haver and Head were in "complete active control" of Noah and the Hacienda project during most of the construction, through August 23, 1972. We hold that the trial court did not err on either the facts or the law in concluding that O'Haver was a managing officer of Noah.

■ O'Haver argues that he should not be liable for lienable claims that became due and owing after the date when, as the master found, O'Haver ceased to be a managing officer of Noah. The master and the trial judge implicitly rejected this contention. We agree that O'Haver is liable for the entire amount of lienable claims established in this action. But for the diversion of tens of thousands of dollars from the Noah account during the period in which O'Haver was a managing officer of Noah, all of the mechanics' and materialmen's liens might very well have been discharged. Under Sections 152 and 153, *supra*, O'Haver was entrusted with funds to be paid for "all valid lienable claims due and owing or to become due and owing," not simply those due while O'Haver was a managing officer. In *Toles v. Green*, 544 P.2d 910, 920 (Okl. App., 1975), the court stated:

> On their face the statutes, in creating a "trust" of construction funds, appear to be protective in nature—protective of the rights of all to whom an obligation is owed for the fund's proper disbursement.

For this reason, we construe the statutes liberally as though they are remedial statutes. 544 P.2d, at p. 920.

■ O'Haver, though he be liable to the mechanics and materialmen, is not liable to Noah for compensatory and punitive damages. The master found that the written agreement in which O'Haver and Head acknowledged their debt to Noah for amounts diverted from the Noah account was intended to operate as a settlement of all claims Noah might have against the pair. The district court adopted the master's finding as not clearly erroneous. The court entered judgment for O'Haver and Head. Noah argues that the agreement reached among O'Haver, Head and Newman could not reasonably be interpreted as a settlement. It further argues that the agreement could have no binding effect on Noah, as Noah was not a party to the agreement, and as O'Haver and Head gave no consideration for Noah's alleged release.

■ If the master meant that the writing was a contract of settlement, whole and complete in itself, we must disagree. The instrument does not purport to bind Newman or Noah to performance of any kind. Even so, we hold that the special master and district court were not clearly erroneous in concluding that the parties had reached an understanding whereby O'Haver and Head would make amends in order to avoid legal action by Newman or Noah. The written agreement and the promissory notes executed pursuant to that agreement are evidence of the parties' understanding. O'Haver and Head agreed to and did assign Newman their stock interests and incident voting rights in Noah as security for their debts. That constituted good consideration on their part as defined by Oklahoma law. Title 15, Okl.Stat.1971, § 106; [5] *State ex rel. Derryberry v. Kerr-McGee Corporation*, 516 P.2d 813 (Okl.1973). Noah has not enlightened us as to why O'Haver and Head would

---

**5.** 15 O.S. § 106 states:

Any benefit conferred, or agreed to be conferred upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suf-fered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.

sign a written acknowledgment of their debts, execute promissory notes in favor of Noah, turn complete control of Noah over to Newman, and (in O'Haver's case) pay off a substantial portion on the note without receiving something in return. We hold that the district court was not clearly erroneous in adopting the master's finding that that "something" was an assurance that O'Haver and Head would not be sued for diverting funds from Noah. The fact that only Newman, and not Noah, signed the written agreement does not compel the conclusion that Noah was not included within the broad understanding reached by the parties. The master, moreover, found that at the time of the agreement and thereafter, Newman and Noah were one and the same. Newman may not elude his contractual obligations by hiding behind the corporate mask of Noah.

We turn next to the question of whether the district court erred in entering judgment in favor of Noah and against O'Haver for an amount remaining unpaid on the promissory note executed by O'Haver. At the hearing, O'Haver sought to prove that the note had been satisfied in full by offering evidence showing that O'Haver had assumed or discharged lienable claims against Noah in an amount greater than the value of the note. The master admitted the evidence for whatever probative value it might have, and gave O'Haver credit for most of that which was claimed. The master declined to give credit for the balance. At the time the Hacienda project was being constructed, O'Haver and Head were engaged in at least three other construction projects. O'Haver offered no testimony or documentary evidence which established that accurate records were kept as to the distribution of goods and materials among the various projects. [Settlement and Approval of Statement of Evidence and Proceedings, R. Vol. II, pp. 449, 450.] Some of O'Haver's evidence relating to discharge of liens was not adequately identified, or its applicability to the Hacienda project was not clearly established. Other evidence did not establish O'Haver's payment or assumption of liens without recourse. [Report of Special Master, R., Vol. II, p. 436.] A special master's finding of fact, when sufficiently specific and adopted by the trial court, are presumptively correct. *H. Codding & Sons v. Armour and Company*, 404 F.2d 1 (10th Cir. 1968). O'Haver does not direct our attention to the specific bits of evidence which the master claimed were inadequate, and which might indicate to us that the master was in error. Instead, we are referred to a heap of messages, statements, waivers, invoices and other papers, some of which are purported to show that the liens at issue were assumed or discharged by O'Haver, and through which we are expected to pick like a trio of carrion crows. O'Haver, in fact, fails to tell us which of the liens are at issue. We hold that the master and the trial court did not err in concluding that O'Haver did not fully satisfy the promissory note in favor of Noah.

## II.

We are here concerned with several issues relating to the O'Havers' liability as signatories to the Guaranty.

The O'Havers argue that as guarantors of the Agreement, they were exonerated when CI and Newman, on Noah's behalf, amended the Building Loan Agreement.[6] We reject this argument. The Guaranty provides that the O'Havers' liability is unaffected by "any amendment or modification of the provisions of the Building Loan Agreement." The O'Havers urge that they should, at the least, be entitled to a set-off on the judgments against them for amounts advanced by CI under the amendment and applied, without the O'Havers' consent, to purposes not authorized by the Agreement.

---

**6.** 15 O.S. § 338 states:

A guarantor is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, *without the consent of the guarantor,* the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in response thereto, in any way impaired or suspended. (Emphasis supplied.)

They point to $12,000 which CI collected as a fee from Noah in consideration for allowing the Agreement to be amended, some $20,000 in interest paid to CI during the period Newman controlled Noah, and roughly $13,000 which Noah disbursed in payment of nonlienable claims.

■ Assuming, *arguendo,* that the O'Havers, as guarantors, could not be bound by amendments to the Agreement so far-reaching as to transform its essence, we are nevertheless not impressed by the O'Havers' argument. The $12,000 fee was within the spirit if not the letter of the Agreement,[7] and is not attacked as excessive or unreasonable. The $20,000 in interest payments does not appear to have stemmed from an amendment in the Agreement at all, but rather from unamended provisions of the Note[8] and the Mortgage.[9] Finally, the O'Havers fail to detail facts which show that CI knew, or should have known, that Newman would apply loan proceeds to purposes not authorized by the Agreement. The gist of the O'Havers' contention seems to be that a lender has an affirmative duty to shadow every move of the borrower's agents in order to prevent misapplication of the moneys advanced. The O'Havers have not cited any authority for this proposition, cogent or otherwise, and indeed, they appear to have forgotten that *they* are the guarantors. Long ago in *Masters v. Boyes,* 44 Okl. 526, 145 P. 363 (1914), the Oklahoma Supreme Court explained:

. . . [U]nder an absolute and unconditional guaranty, the duty is upon the guarantor to see that his contract of guaranty is fulfilled, and that the obligations of the principal are discharged at maturity; and, in the absence of fraud which may be the proximate cause of damage to the guarantor, [the guarantor will not be discharged from liability]. 145 P., at p. 365.

We hold that the O'Havers are neither exonerated nor entitled to a set-off on the judgments against them and in favor of CI.

■ The district court included the $40,000.00 attorneys' fees allowed CI against O'Havers by the special master. Even though this award was not pleaded or solicited by CI, it is not precluded if CI is otherwise entitled to it. Fed.R.Civ.P., rule 54(c), 28 U.S.C.A.;[10] *Southwestern Investment Co. v. Cactus Motor Co.,* 355 F.2d 674 (10th Cir. 1966). The parties agree that if the award of attorneys' fees is to be made at all, it must be predicated on the language of the Guaranty signed by the O'Havers and admitted in evidence. The district court found that language to be clear and unambiguous. We agree. In Paragraph Two (2) the O'Havers guaranteed "all the Borrower's obligations under the Building Loan Agreement *and the Mortgage* . . . including the Borrower's obligation for the payment of all legal and other costs and expenses paid or incurred by the Trust in the enforcement thereof against the Borrower or the undersigned." (Emphasis supplied.) The "Bor-

7. Paragraph Three (3) of the Agreement states: Borrower, at the time of the execution of this Agreement, shall pay all fees and charges agreed to be paid to the lender for the procuring and making of said loan, the fees and disbursements of Lender's counsel, the charges for the examination, survey and insurance of title to the premises, and all taxes and recording expenses, including stamp taxes, if any.

8. The Note states: . . . [T]he undersigned . . . does hereby covenant and agree to pay . . . the Amount of the Note . . . or so much thereof as may be advanced . . . together with interest . . . payable monthly on the first day of the first month following the first advance under the Building Loan Agreement and on the first day of each month thereafter . . .

9. Paragraph Two (2) of the Mortgage states: . . . The Mortgagors will punctually pay or cause to be paid the principal and interest . . . and all other sums to become due in respect of the Note or any renewals or extensions thereof, at the time and place and in the manner specified therein . . .

10. Rule 54(c), Fed.R.Civ.P., states: *Demand for Judgment.* . . . Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.

rower's obligation" under Paragraph Nineteen (19) of the Mortgage includes payment of CI's attorneys' fees both in enforcing the Agreement and in foreclosing under the Mortgage.[11] The district court, therefore, did not err in assessing the O'Havers for all reasonable attorneys' fees incurred by CI in the proceedings below.

■ The O'Havers further urge that they were deprived of due process. This allegation merits scant attention. The trial court did not hear the evidence directly. The reporter employed to record the proceedings before the special master was killed and his notes were destroyed in an automobile accident. Thus the trial court and this court do not have the benefit of a transcript of the evidence. In some circumstances, we are sure, the lack of a complete transcript of trial would call the fairness of the proceedings into question. In the instant case, however, the O'Havers have not shown that they were in fact prejudiced by the omission. The parties produced a substitute record by resort to the procedures set forth in Fed.R.App.P., Rule 10(c), 28 U.S.C.A.[12] More important, our holdings today are based upon the law and upon facts which the O'Havers do not seriously dispute.

The O'Havers' final argument requires a review of several facts. First, the O'Havers guaranteed the performance of Noah's obligations under the Agreement and the Mortgage. Second, the constituent items of CI's judgments against the O'Havers—costs of completing the Hacienda project, the sum of mechanic's and materialmen's judgments with attorneys' fees, costs and expenses of CI's receiver, and CI's attorneys' fees—correspond to certain of Noah's obligations under the Agreement or the Mort-

gage. Third, the district court allowed CI to enforce its judgments against the guarantors O'Haver only to the extent that proceeds from the sale of Noah's Hacienda project were insufficient to reimburse CI for the constituent items of the judgments. Fourth, the property was sold, but the proceeds were insufficient. Fifth, CI failed to obtain a deficiency judgment against Noah within ninety (90) days after the date of the foreclosure sale.

CI admits, and we agree, that by the terms of Title 12, Okl.Stat.1971, § 686,[13] the "mortgage debt" which Noah owed CI must now be deemed fully satisfied by the proceeds of the foreclosure sale. The O'Havers take CI's admission a step further. They conclude that CI may not enforce its judgments against them because the proceeds from the sale of Noah's Hacienda project, in the fictional sense of Section 686, *were sufficient* to reimburse CI. The O'Havers rely upon *Apache Lanes, Inc. v. National Educator's Life Ins. Co.*, 529 P.2d 984 (Okl., 1975), for the proposition that guarantors are not liable for debts deemed satisfied by operation of Section 686.

■ We think the O'Havers' reasoning falters on two points. First, Section 686 speaks only to satisfaction of "mortgage debts" in the aftermath of "actions to enforce a mortgage, deed of trust, or other lien or charge . . . ." At least one item of the judgments against the O'Havers, that of payment of the costs of completion of the Hacienda project, corresponds to one of Noah's obligations under the Building Loan Agreement,[14] and cannot be considered a mortgage debt within the scope of Section 686. Noah's obligations under the Agreement were not secured by a mortgage

---

**11.** See text, page 3, *supra.*

**12.** Rule 10(c), Fed.R.App.P., states:

*Statement of the Evidence or Proceedings When no Report Was Made or When the Transcript is Unavailable.* If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including his recollection. The statement shall be served on the appellee, who may

serve objections or propose amendments thereto within 10 days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal.

**13.** See Footnote 1, pages 366–367, *supra.*

**14.** See text, pages 2, 3, *supra.*

or any other lien on property, real or personal. As CI suggests, the Agreement and Guaranty took the place of the usual and customary performance bond required to be posted by a construction bonding company as a separate protection of a lender's investment, apart from security interests. Although this court has applied Section 686 to a non-mortgage debt which arose from an action "plainly ancillary" to foreclosure proceedings, *Ingerton v. First National Bank & Trust Co. of Tulsa,* 291 F.2d 662, 666 (10th Cir. 1961), we cannot characterize CI's action against the O'Havers on a guarantee of Noah's obligations under the Building Loan Agreement as ancillary to the other proceedings herein. In *Ingerton, supra,* the mortgage and non-mortgage debts appear to have been merely two facets of a single obligation to pay on a promissory note. In the instant case, a single instrument, the Guaranty, is a hybrid of obligations relating to two distinct duties owed by Noah to CI. One of these duties was secured by a mortgage; the other was not. Where actions to enforce both duties are joined in one proceeding, neither, in our opinion, must be considered ancillary to the other.

■ Insofar as items of the judgments against the O'Havers correspond to Noah's mortgage debts deemed satisfied by operation of Section 686, we believe that one provision of the Guaranty deprives the O'Havers of whatever benefit they might have gained by the fictional satisfaction of debts under that section. In Paragraph Three (3)(iii) of the Guaranty, the O'Havers consented to liability notwithstanding "the release of the Borrower [Noah] from performance or observance of any of the agreements, covenants, terms or conditions contained in [the Agreement and the Mortgage] by operation of law . . .." The O'Havers argue that the consent provision is of no effect in that "all rights and obligations of CI and the O'Havers in the 'Guaranty of Completion Agreement' merged in the judgment." [No. 77–1195, Brief of Ap-

pellants, Louis G. O'Haver and Betty K. O'Haver, p. 15.] We disagree. Causes of action, not entire contracts, are merged into judgments. *United States Fidelity & Guaranty Co. v. McCarthy,* 33 F.2d 7 (8th Cir. 1929). The consent provision is simply a defense to the O'Havers' Rule 60(b)(5) motion for relief from judgment. It is not a defense which might have been urged in earlier proceedings, and nothing prevented CI from raising it at the hearing on the motion.

The O'Havers argue that the consent provision cannot be interpreted as applicable to Noah's post-judgment release by operation of Section 686. Their point appears to be that Section 686 released Noah from the terms of the judgment, and not, as the consent provision requires, from those of the Agreement or the Mortgage. The language of the statute does not support the O'Havers' argument. Section 686 operates upon "mortgage debts," and satisfaction of those debts was, of course, Noah's obligation under the Mortgage.

■ The O'Havers thus stand liable under the Guaranty. The consent provision amounts to a guarantee of satisfaction in fact. It does not, as the O'Havers suggest, restrict the guarantors from enforcing their rights under the Guaranty in contravention of Title 15, Okl.Stat. § 216.[15] Rather, it defines those rights. The O'Havers do not dispute that payment of the mortgage debt was among the obligations assumed by Noah. And they do not argue that the fictional satisfaction of the mortgage debt under Section 686 was anything but a release of Noah "by operation of law." The district court, therefore, did not err in denying the O'Havers' Rule 60(b)(5) motion.

### III.

The special master found that the Bank acted reasonably when, as instructed by O'Haver or Head, it deposited advances on

---

**15.** 15 O.S. § 216 states:
Every stipulation or condition in a contract, by which any party thereto is restricted from enforcing his rights under the contract by the usual legal proceedings in the ordinary tribunals, or which limits the time within which he may thus enforce his rights, is void.

the Noah loan to the Head-Hacienda account rather than to the Noah account. He also found that O'Haver and Head gave their instructions to the Bank in their capacities as Noah officers and that, under such circumstances, Noah "received" the advances. The district court adopted these findings. Nevertheless, Noah contends that the Bank is liable for converting its funds.

 We certainly doubt that Noah gave O'Haver and Head actual authority to use corporate funds for their private purposes. But O'Haver and Head were surely cloaked with the apparent authority to direct that Noah funds be deposited to an account labeled "Head Construction, Hacienda Apts. Project." The Bank held a signature card from Noah which stated that O'Haver and Head were officers of Noah and authorized to endorse and deposit checks for Noah, write checks on Noah's account, and generally "transact financial business of the corporation with the Stillwater National Bank." The president of the Bank knew that O'Haver, Head and Newman were building an apartment project, that Head was the general contractor and that the advances from CI represented construction funds. [Deposition of Bob McCormick, R. Vol. XVIII, p. 7.] Nothing indicates that the Bank knew or had reason to know that O'Haver and Head were misappropriating corporate funds, or that it acted contrary to the custom of the Oklahoma banking industry. Noah, on the other hand, may be deemed to have permitted O'Haver and Head to act beyond their authority. O'Haver and Head were in complete active control of Noah at the time.

In *McNutt Oil and Refining Co. v. Mimbres Valley Bank,* 174 F.2d 311 (10th Cir. 1949), a case similar to the one at bar, this court stated:

> The test [of a third party's liability] is what powers, persons of ordinary prudence, familiar with business practices, dealing with the agent, without knowledge of any limitation on the agent's authority, might reasonably believe him to have on the basis of the principal's conduct. 174 F.2d, at p. 313.

Applying the above test, we hold that the district court did not err in entering judgment for the Bank.

WE AFFIRM.