**CMI CORPORATION,**
**Plaintiff-Appellant,**

v.

**Raymond A. GURRIES, et al.,**
**Defendants-Appellees.**

No. 80–2272.

United States Court of Appeals,
Tenth Circuit.

Feb. 23, 1982.
Rehearing Denied April 19, 1982.

Reggie N. Whitten of Foliart, Mills & Niemeyer, Oklahoma City, Okl. (Earl D. Mills, Oklahoma City, Okl., with him on the brief), for plaintiff-appellant.

David Buoncristiani of Thelen, Marrin, Johnson & Bridges, San Francisco, Cal. (Douglas Sullivan of Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., and John Joseph Snider of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., with him on the brief), for defendants-appellees.

Before SETH, Chief Judge, and McWILLIAMS and PECK *, Circuit Judges.

SETH, Chief Judge.

This appeal centers on a contract whereby CMI Corporation purchased all the stock of Gurries Manufacturing Company. Both companies were engaged in the design, development, and manufacture of equipment used in road building and paving. There was to be made a lump sum payment under the contract to pay the debts of the Gurries Company, and in addition, "Supplemental Payments" were to be made to its stockholders for a 15-year period computed on the net sales price of certain complete machines and on described components used on other machines sold by CMI.

The dispute relates solely to the construction of the contract terms relating to the type of machine or devices for which the Supplemental Payments should be made. The disagreement is as to what machines are "graders" or "motor graders," and more particularly whether the Roto-Mill Profiler is a "grader" as the trial court found under the contract. The principal officers of each company and who negotiated the contract each had spent many years in the business.

The amended complaint of CMI for a declaratory judgment against Raymond Gurries and others asked that the machine manufactured by CMI known as a Roto-Mill Profiler be decreed not a "motor grader" as the term was used in the contract. It also asks that as to the same machine Supplemental Payments be determined under paragraph 3(b) provided there be valid patent claims. The complaint also asks that certain patents assigned to CMI by the Gurries Company and Mr. Gurries be held invalid, and no payments need be based on devices covered by invalid patents.

The discussions during the contract negotiations, according to the record, were directed only to graders or motor graders. CMI was interested in the grader being developed by Gurries Company and wanted to begin to produce and market such a road grader with the automatic controls. This was something that had not been done before by CMI. CMI at the time had a prototype of a grader with automatic controls but it had not gone into production. The contract in paragraph 10 says in part: "Upon execution of this Agreement CMI agrees to immediately commence efforts for production and sale of Motor Graders as defined herein."

The Stock Purchase Agreement was entered into in July of 1969. The lump sum payment to Gurries Company was made and the parties, as contemplated by the contract, began a grader development and sales project in CMI with Mr. Gurries in charge. CMI provided the facilities and the money. There was so developed a road grader with automatic controls. However, for several reasons including poor market conditions fewer graders were sold than was contemplated by both parties. This grader was the only complete machine designed and developed by Mr. Gurries while he was employed at CMI. This he so acknowledged at trial.

By 1972 there was a disagreement between Mr. Gurries and CMI as to how the Supplemental Payments were to be comput-

* Honorable John W. Peck, United States Circuit Judge for the Sixth Circuit, sitting by designation.

ed and what machines produced by CMI were to be included for the Supplemental Payments. Mr. Gurries in 1972 and thereafter took the position that all CMI machines should be included or all with but minor exceptions. Attempts were made to settle and a compromise letter was signed in 1975 with both sides giving up a portion of their claims. However, an agreement was never reached as to what constituted a "grader" as the term was used in the original contract.

The witnesses from the industry all testified that the prevailing definition of "graders" or "motor graders" used in the business at the time was a six or eight wheel machine with rubber tires, with a circle and blade or moldboard used to move soft or loose materials such as dirt or loose asphalt.

Mr. Gurries testified that there was a definition for "motor grader" in use in the industry. He further testified in answer to separate questions that at the time the contract was entered into his definition of a motor grader was a motorized four or six wheel rubber-tired machine with a circle on it and a moldboard. It was used for grading primarily earth, maybe on asphalt, but not on concrete as a usual thing. Mr. Gurries shortly before the contract had been seeking to apply automatic controls for grade and slope to such conventional graders and this is where it all began. If Mr. Gurries held to a different definition at the time of the contract, or if he intended the definition to be as broad and as different as he now contends, he did not advise Mr. Swisher during the negotiations that his definition of "grader" was different from that prevailing in the industry.

The Stock Purchase Agreement in part provides:

"3. *Supplemental Payments.* As additional consideration for such shares, CMI does hereby agree to make supplemental payments to the Stockholders quarterly each year for fifteen years measured by the net sales by Gurries, CMI, or any of their subsidiaries, licensees or sublicensees of motor graders, and other apparatus and equipment covered by a claim of

an unexpired patent right held by Gurries from January 1, 1970 to December 31, 1984, on the following amounts:

"(a) One and one-half percent (1.5%) of the net sales of all motor graders.

"(b) [Sub-assemblies for motor graders sold separately].

"(c) [Division of royalties from patent 3158945].

"(d) One-half of one percent (.5%) of the net sales of all apparatus covered by a claim included in an unexpired patent right of Gurries other than motor graders and parts or components suitable for use in motor graders.

. . . .

"5. *Definitions.* In determining the amount of the supplemental payments to be due the Stockholders from CMI as additional consideration for the shares of capital stock of Gurries, the following definitions shall be applied:

"(a) [Patents].

"(b) [Net sales].

"(c) 'Motor grader', as used herein, shall mean a grader having control systems incorporated therein or thereon for automatically controlling grade and/or slope, or constructed to receive a system for automatically controlling the elevation or angle of the main frame."

The contract in paragraph 3, as quoted above, separates the Supplemental Payments to be made for complete motor graders from those payments to be made for other things—apparatus covered by patent claims or components. The payments are to be at different rates and only the component-apparatus section refers to or is conditioned on the status of patents.

There is no indication in the contract that the presence or absence of a device covered by a Gurries patent claim when placed on a machine places the entire machine under paragraph 3(a). Specific subparagraphs are intended to cover particular devices covered by patents. The trial court indicates that the presence of Servo Valves or suspensions covered by Gurries' patents would make the

entire machine subject to payments under 3(a) and thus make it a "motor grader." This the trial court did as to the Roto-Mill Profilers which were the center of the dispute.

The Roto-Mill Profiler about which much of the dispute centers was developed by CMI after Mr. Gurries had left the company. There was no design or drawings for it until after he had left. Mr. Gurries asserts that the Supplemental Payments provision as to complete machines applies because it is a motor grader. The Roto-Mill Profiler is a unique machine, according to the record, used to chip off the top few inches of concrete pavement or hard asphalt pavement. The basic part of the machine is a large mandrel with tungsten carbide removable teeth which revolves at a very high speed within a covered portion of the machine where the teeth can be cooled with water. It has no moldboard, no circle, does not push loose material, and instead is used only for very hard materials.

CMI had been making a line of machines before the contract and there is nothing in the record to indicate that these would be included for Supplemental Payments. The Supplemental Payments provision for complete machines was directed to conventional motor graders with automatic controls and only those. The paragraph 3(a) refers only to sales of "motor graders" and the contract provisions must control.

■ As mentioned, there was an accepted definition in the industry for "motor graders." As recognized by the trial court, Oklahoma has a statutory provision (15 O.S. § 161) which in part provides:

"Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."

Oklahoma case law holds that a party to a contract cannot fail to disclose a meaning he attaches to a term which is not in accordance with the accepted meaning in the industry when he is aware or should be aware that the other party is using the term in its accepted sense. Mr. Gurries testified that he did not recall talking to Mr. Swisher or calling his attention to the fact that he, Mr. Gurries, intended "to cover by the definition of motor grader machines other than those conventional motor graders as they existed in 1969."

■ In the contract definition of a grader the parties were careful to limit the machines to *graders*. Thus the contract provides that: " 'Motor Grader', as used herein, shall mean *a grader* having control systems ...." (Emphasis added.) The contract does not say *any* machine having control systems, but instead *a grader* which has automatic systems. The word "grader" with its meaning accepted in the industry is the limiting factor. The trial court in its conclusions of law read the word "grader" out of the definition and said in substance that any machine with automatic controls should be included. This cannot be done to change the entire structure of the contract. The parties limited the Supplemental Payments provision and the courts cannot expand them. The contract provides for payment of one and one-half percent for "motor graders." This, again, must be applied as written and with the meaning prevailing in the industry. This meaning is not overridden by other factors in the record as the trial court indicates.

The trial court has by its conclusions removed the distinction between paragraphs 3(a) and 3(d). The paragraph 3(a) was designed to include entire machines—"motor graders" as therein expressly provided. Paragraph 3(d) was designed to require payments for "apparatus" other than motor graders "covered by a claim included in an unexpired patent," the payment for such components to be at one-half of one percent of net sales.

The trial court in its conclusions apparently moved into paragraph 3(a) all machines which had in them any element of a Gurries patent. Thus those with Gurries' suspension patent and Servo Valve patents were considered to be complete machines under 3(a) and for all practical purposes eliminated paragraph 3(d).

We find no construction of the term in issue by the parties. There was instead a serious ongoing dispute which has continued since 1972 as to the Supplemental Payments. This disagreement as to the term in issue precluded any construction by practice. There were repeated attempts to settle the problem but without success. These attempted settlements included the letter agreement in May 1975 which clearly represented a compromise with both sides giving up some of their claims. This letter again failed to settle the issue because a definition again could not be agreed upon. The immediate problem was met by references to particular machines as the compromise. The Roto-Mill Profiler was not in existence at the time of the letter agreement. The fact that CMI may have paid for a while on the Roto-Mill Profiler at a later date is also of no assistance as it soon changed its position and changed the entries from the outset, and the disagreement continued.

■ As mentioned at the outset, the appeal concerns only the construction of a portion of a written contract. The construction of a contract which is not ambiguous is a matter of law. *Colorado Springs National Bank v. United States*, 505 F.2d 1185 (10th Cir.); *C. H. Codding & Sons v. Armour and Co.*, 404 F.2d 1 (10th Cir.); *Ryder Truck Rental, Inc. v. Central Packing Co.*, 341 F.2d 321 (10th Cir.); *Standard Acc. Ins. Co. v. Goldberg*, 120 Okl. 108, 250 P. 892. The testimony contains no conflicts as to the meaning given to the disputed term by the industry, the state law is clear on the subject, and we must conclude that the trial court's interpretation of the provision to include the Roto-Mill Profiler as a "grader" in paragraph 3(a) of the Stock Purchase Agreement was clearly erroneous.

The plaintiff in an Amended Complaint sought to have litigated the validity of certain patents unconditionally assigned to it by Gurries Company. The relief sought was also part of the construction of paragraph 3 of the Agreement wherein payments other than on motor graders are provided for. Paragraph 3(d) provides for payments on the net sales of "apparatus cover-ed by a claim included in an unexpired patent right of Gurries." Also paragraph 3(b) refers to payments on sub-assemblies for graders "providing such sub-assembly is covered by a claim of an unexpired patent included in patent rights of Gurries."

■ As to the patent issue, the trial court concluded that Supplemental Payments were to be made "regardless of the validity or invalidity" of any patent. The court reached other conclusions that a patent issue or validity issue was not present.

However, considering the definite and particular wording of the contract we are led to a conclusion that enforceable or valid patents were described and set forth as a condition to certain of the payments; that is, all payments except for motor graders as complete machines. There can be no other purpose for the specific wording. The record demonstrates that both parties were experienced in patent matters and testimony of the principals shows that such protection was important. As to the Servo Valve the testimony of Mr. Gurries was that it could not be reverse engineered, but he nevertheless proceeded with the patent application after the contract date. With the express provisions in the contract it cannot be concluded that patents were not of considerable consequence and in fact were set forth as conditions in the Supplemental Payments provision. The finding or conclusion of the trial court that payments were to be made regardless of patent validity is clearly erroneous.

■ The matter of patent validity was a trial issue and should have been determined. We do not reach the *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610, problems in view of the contract provisions. *Scott Paper Co. v. Marcalus Co., Inc.*, 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, in our view decides the assignment issue if it is really present.

The case is reversed and remanded for further proceedings.