PUBLIC SERVICE COMPANY OF OKLAHOMA, Plaintiff–Appellee,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, Defendant–Appellant.

No. 94–5133.

United States Court of Appeals, Tenth Circuit.

April 18, 1995.

---

Samuel M. Sipe (Thomas M. Barba and David A. Stein of Steptoe & Johnson, Washington, DC, J. Warren Jackman of Pray, Walker, Jackman, Williamson & Marlar, Tulsa, OK, and Janice G. Barber, Fort Worth, TX, of counsel, with him on the briefs), for appellant.

Richard P. Hix (William C. Anderson, Lewis N. Carter and Jon E. Brightmire of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, OK, and Orrin Harrison, III, Harry M. Reasoner and Michael J. Henke of Vinson & Elkins, Dallas, TX, with him, on the brief), for appellee.

Before KELLY and BARRETT, Circuit Judges, and OWEN,* District Court Judge.

* The Honorable Richard Owen, Senior District Judge, United States District Court for the South-

BARRETT, Senior Circuit Judge.

Burlington Northern Railroad Company (BN) appeals from an order of the district court granting partial summary judgment in favor of Public Service Company of Oklahoma (PSO) and denying BN's motion for summary judgment. In this diversity case, we are called upon to review an issue of contract construction governed by Oklahoma law.

### Facts

During the early 1970's, BN began developing rail transportation in the Powder River Basin of Wyoming to enable it to ship extensive coal deposits in that region. (Joint Appendix at 1142). One route, known as the Orin Line, was completed in 1979 at a cost of $113 million. *Id.* In addition to adding new track, BN improved some 10,000 miles of existing track to handle the weight of the 15,000 ton coal trains. *Id.* at 1143. BN's capital spending began to decline in 1980–81 and it attempted to recoup its investments from increasing coal traffic. *Id.*

By 1984, however, it became evident to BN that its Powder River Basin trackage required substantial repair and maintenance due to the strain of the heavy coal trains, the extreme weather, and the terrain conditions of northeast Wyoming. *Id.* Due to the magnitude of its maintenance and expansion efforts, it became important for BN to secure long-term transportation agreements from utilities and other shippers of coal with guaranteed minimum and maximum annual commitments. *Id.* at 1144.

On August 27, 1985, BN and PSO entered into a Coal Transportation Agreement (Agreement) under which BN agreed to transport Wyoming coal purchased by PSO to PSO's electric generating facilities in Oklahoma. PSO desired "BN to transport, and BN desire[d] to transport [for PSO] certain specified volumes of coal in unit trains." (Joint Appendix at 0145).

It was the "intent of the parties ... that [PSO will] receive reliable, high volume, unit train transportation service at a cost which is

ern District of New York, sitting by designation.

ascertainable and which reflects overall economic conditions and indices, and that BN [will] provide such transportation services at rates which [will] fairly and adequately compensate BN." *Id.* at 0194–95. In the event that either one of the parties "believes that the intentions of the parties as above described ha[s] not been effectuated," then "either party shall have the right to request renegotiation of the Effective Rate and/or renegotiation of the adjustment method." *Id.* at 0195.

Based on the above intentions, the parties agreed that BN would transport coal for PSO at a base rate of $14.00 per net ton, as adjusted, pursuant to the Agreement, and that PSO would tender a minimum of 2,600,-000 tons of coal for each year of the long term contract.[1] *Id.* at 0157 and 0168. "The parties acknowledge that the Base Rate, Effective Rate and charges for service provided hereunder are predicated on Utility tendering for transportation no less than such minimum annual volume requirement as may be required under this Agreement." *Id.* at 0193–94. "In the event that [PSO] *fails* to tender to BN for transportation the agreed to minimum annual volume *requirement* for any calendar year *as required* under this agreement," then PSO "shall have a 'tonnage shortfall' [for which it shall pay BN] ... liquidated damages...." *Id.* at 0194. (emphasis added).

PSO agreed to provide BN written notice by October of each year "of the forecast volume of coal to be tendered for transportation during each quarter of the next calendar year, subject to the requirements of Section 5.1." *Id.* at 0170. In the event that PSO's "coal cars are damaged, destroyed or derailed by BN and have been removed from service, and BN is unable to substitute BN cars as provided for in this section, the minimum annual volume set out in Section 5 shall be reduced." *Id.* at 0180.

PSO could terminate the contract at any time at its "sole and absolute discretion" by paying BN "an amount equal to thirty percent (30%) of the Effective Rate at the date

1. The contract was originally a twelve-year agreement, extended to seventeen years in 1987.

of termination multiplied by the minimum annual volume requirement as described in Section 5 ... for each full calendar year remaining in term of the Agreement." *Id.* at 0205. The parties further agreed that PSO could commence shipping "beneficiated coal" (coal which has been dried or otherwise treated or processed beyond the raw state), but "[i]t is understood and agreed that [PSO's] minimum volume requirement as set forth in Subsection 5.1 ... will not be reduced as a result of the transportation of Beneficiated Coal pursuant to this Agreement, both parties recognizing that Beneficiated Coal may require less tonnage than Coal otherwise transported to achieve the same Btu value...." *Id.* at 0213.

The parties agreed that "[n]either party may assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party," and that "[a]ll amendments, supplements, modifications to and waivers of the terms of this Agreement shall be in writing and signed by the parties hereto...." *Id.* at 0216.

To meet its obligations under the Agreement, BN purchased seventeen locomotives at a cost of approximately $13 million. *Id.* at 1146. The Agreement had an original expiration date of December 31, 1997, subsequently extended in 1987 to December 31, 2002.

Section 5.1 of the Agreement provided, in part:

*Tender of Tonnages; Origins*

Subject to the Force Majeure provisions of Section 12, Utility hereby agrees to tender, or cause to be tendered to BN for transportation, each calendar year ... a minimum of 2,600,000 tons of Coal ... and to pay for such transportation at the Effective Rate set forth in Section 4 hereof....

 \* \* \* \* \* \*

In the event tonnage in excess of 2.6 million tons per year is to be shipped from the Powder River Basin in Wyoming to Destination and Utility has received a quotation of a lower rate than the Effective Rate under this Contract, Utility, in so far as it is able, must give BN the price terms of the competitor's written quotation ... and

Utility shall give BN the final opportunity to meet such competitive rate on such tonnage in order to prevent diversion.

(Joint Appendix at 0168–69).

Section 10. of the Agreement provided, in part:

*Indemnification for Failure to Tender Minimum Annual Tonnage*

The parties acknowledge that the Base Rate, Effective Rate and charges for service provided hereunder are predicated on Utility tendering for transportation no less than such minimum annual volume requirement as may be required under this Agreement during each calendar year of the Agreement subsequent to the initiation of Single Line Direct Service by BN. In the event Utility fails to tender to BN for transportation the agreed to minimum annual volume requirement for any calendar year as required under this Agreement, Utility shall have a "tonnage shortfall." In such event, Utility agrees to pay the following sum to BN as liquidated damages, and not as a penalty, for any tonnages not shipped during any calendar year and such liquidated damages shall be calculated as follows....

(Joint Appendix at 0193–94).

Section 16.2 provided:

*Termination for Convenience*

Utility may terminate this Agreement at any time at Utility's sole and absolute discretion. Any such termination shall be effective by written notice from Utility to BN at least six months in advance of such termination. After receipt of such notice of termination, BN shall be entitled to receive from Utility an amount equal to *thirty percent (30%) of the Effective Rate* at the date of termination multiplied by the minimum annual volume requirement as described in Section 5 hereof for each full calendar year remaining in the term of the Agreement. The provisions of Section 10 hereof shall govern the amount owed by Utility for any failure by Utility to meet its minimum annual volume requirement during the calendar year in which a termination pursuant to this Subsection occurs. Payment of the amount due hereunder

shall constitute the sole and exclusive remedy against Utility by BN in the event of Utility's Termination For Convenience.

(Joint Appendix at 0205–06).

From 1986 through 1991, PSO shipped a minimum of 2,600,000 tons of Wyoming coal annually with BN in accordance with the Agreement. In 1992, however, PSO entered into a transportation agreement with Chicago and North Western Railroad Company and the Union Pacific Railroad Company, hereinafter jointly referred to as CNW/UP, after "the high rate for hauling coal under the Agreement [made it] economically advantageous for PSO to pay BN liquidated damages under § 10 and to ship coal on the spot market on the Union Pacific Railroad." (Joint Appendix at 0089). In 1992, PSO shipped approximately 1,000,000 tons of coal on CNW/UP. *Id.*

### Litigation

After BN asserted that the shipments on CNW/UP breached the Agreement, PSO filed a complaint on June 1, 1992, seeking a declaratory judgment, alleging, *inter alia:* the Agreement permitted it a buy-out of one million tons of coal for 1992; PSO's use of CNW/UP to transport coal was not contrary to BN's contract rights, and; PSO had not breached the Agreement nor engaged in any other wrongful or tortious conduct in violation of the Agreement.

BN moved for summary judgment, contending, *inter alia,* that: PSO was obligated under the agreement to ship a minimum of 2,600,000 tons of coal each year with BN; § 10 of the Agreement did not provide PSO a buy-out option in derogation of PSO's specific minimum performance obligations; § 12 of the Agreement excused PSO from meeting its minimum tonnage obligation only for unanticipated force majeure, and; PSO's interpretation of § 10 is inconsistent with § 16.2.

On December 9, 1992, the parties entered into an "Agreed Stipulations and Limited Case Management Order" in which the parties agreed, *inter alia:*

2. The parties stipulate and agree that, where Section 10 of the Agreement applies, Section 10 is enforceable and PSO is permitted and required to pay BN liquidated damages (as calculated pursuant to Section 10) as a result of a "tonnage shortfall" (as that term is used in Section 10); and further stipulate and agree that, where Section 10 applies, and provided PSO tenders timely payment of such liquidated damages to BN, BN is entitled to no further amounts of money as a result of a "tonnage shortfall," and PSO is not in breach of the Agreement as a result of a "tonnage shortfall." It is the parties' agreement and intent that they are bound by the foregoing stipulation whether or not the court decides to enter this order. . . .

3. Notwithstanding the foregoing stipulation, the parties acknowledge that they continue to have a dispute concerning the facts and circumstances under which Section 10 of the Agreement applies. PSO contends that Section 10 applies to any "tonnage shortfall," occurring for any reason, including "tonnage shortfalls" occurring as a result of PSO's discretionary election. BN contends that Section 10 applies only with respect to "tonnage shortfalls" which occur under particular facts and circumstances, which do not included "tonnage shortfalls" occurring as a result of PSO's discretionary election to haul coal on a competing carrier.

(Joint Appendix at 0068–69).

On March 30, 1993, PSO filed a motion for partial summary judgment in which it requested the court to determine, as a matter of law, that § 10 "applies to permit and require PSO to make liquidated damage payments in any and all circumstances . . . where PSO does not tender to Defendant, Burlington Northern Railroad Company . . . 2.6 million tons of coal for transportation in a calendar year." (Joint Appendix at 0078) (footnote omitted).

On May 6, 1993, PSO filed a second motion for partial summary judgment in which it requested the court determine, as a matter of law, that under § 5.1 it was "not required to disclose to [BN] the price terms of a competing carrier's bid to haul PSO coal tonnage between 2.6 and 3.6 million tons per year, when the bid from the competing carrier has

been submitted on the condition that it be kept confidential." (Joint Appendix at 0735).

On March 24, 1994, the court entered an order granting PSO's motions for partial summary judgment. The court ruled that § 10 was an alternative performance provision which allowed PSO to unilaterally reduce its minimum annual tonnage commitment to BN. On May 13, 1994, the court entered its final judgment.

### Issues

On appeal, BN contends that: (1) the district court erred by ignoring § 5.1 of the Agreement which establishes an exclusive shipping arrangement between the parties for a minimum of 2.6 million tons per year and prevents diversion to other carriers; (2) the district court erred in viewing § 10 as an alternative performance provision and in disregarding PSO's obligation to make a good faith effort to perform; (3) if we determine that the Agreement is ambiguous, we may consider record evidence confirming that the district court erred in adopting PSO's construction of the Agreement; and (4) the district court erred in disregarding the plain language of the third paragraph of § 5.1 which guarantees BN a final opportunity to transport PSO's coal in excess of 2.6 million tons per year.

### Standards on Appeal

 Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Thrifty Rent–A–Car v. Brown Flight Rental One*, 24 F.3d 1190, 1194 (10th Cir.1994). The interpretation of an unambiguous contract is a question of law to be determined by the court, *Resolution Trust Corp. v. Federal Savings & Loan Insurance Corp.*, 25 F.3d 1493, 1500 (10th Cir.1994), and may be decided on summary judgment. *Utah Power &*

*Light Co. v. Federal Insurance Co.*, 983 F.2d 1549, 1553 (10th Cir.1993).

 In diversity cases governed by state law, we must ascertain and apply the state law so as to reach the same result that the state court would reach. *Id.* Our review of the district court's applications of state law is *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). "If [a] court of appeals finds that the district court's analytical sophistication and research have exhausted the state-law inquiry, little more need be said in the appellate opinion. Independent review, however, does not admit of unreflective reliance on a lower court's inarticulable intuitions. Thus, an appropriately respectful application of *de novo* review should encourage a district court to explicate with care the basis for its legal conclusions." *Id.* at 232–33, 111 S.Ct. at 1222.

### Disposition

#### I. & II.

BN contends that the district court erred by ignoring § 5.1 of the Agreement which establishes an exclusive shipping arrangement between the parties for a minimum of 2.6 million tons per year and prevents diversion to other carriers. BN also contends that the court erred in viewing § 10 as an alternative performance provision and in disregarding PSO's obligation to make a good faith effort to perform. BN, PSO and the district court agreed that the Agreement was unambiguous. (Unsealed Joint Appendix at 053–54, 079, and 110).

Under § 5.1, *Tender of Coal; Origins,* PSO agreed "to tender or cause to be tendered to BN for transportation, each calendar year . . . a minimum of 2,600,000 tons of coal." Under § 10, *Indemnification for Failure to Tender Minimum Annual Tonnage,* PSO agreed to pay BN liquidated damages in the event that it "fails to tender to BN for transportation the agreed to minimum annual volume requirement."

In its order granting PSO's motions for partial summary judgment on §§ 5.1 and 10, the district court ruled:

The court has for its address an issue of contract construction. Specifically: is Section 10 of the Agreement an alternative performance provision which would permit PSO to reduce its tonnage commitment to ship the required minimum of 2.6 million tons of coal over Burlington rails, unilaterally (that is, whenever it is economically advantageous to do so), and to pay liquidated damages equal to 30% of the Agreement's "Effective Rate"? The plain language of § 10 indicates that it is. Therefore, because § 21 of the Agreement directs application of Oklahoma law and because 15 O.S. § 154 requires a "plain meaning" construction of contract language, PSO's construction of § 10 must prevail. The court further finds that the term "fail", as it appears in § 10 is a term of result, not of intent; therefore the court declines to infer that "fail" means unintentionally fail.... Finally, the court finds that the phrases *"permitted and required"* *as found in § 10* supports the court's construction of that Section.

(Unsealed Joint Appendix at 113–14) (emphasis added).

On May 13, 1994, the district court entered an amended order and final judgment in which it acknowledged that the above order had improperly referenced the phrase "permitted and required" to Section 10 and that it should have referenced the phrase to the Agreed Stipulations and Limited Case Management Order of December 9, 1992.

 Section 21. of the Agreement provided that "this Agreement shall be deemed to be a contract made in the State of Oklahoma and governed by and construed according to the laws of that State." (Joint Appendix at 0208). In Oklahoma, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." 15 Okl.St.Ann. § 154. Under Oklahoma law, the interpretation of an unambiguous contract is a question of law for the courts. *Devine v. Ladd Petroleum Corp.*, 805 F.2d 348, 349 (10th Cir. 1986); *CMI Corp. v. Gurries*, 674 F.2d 821, 825 (10th Cir.1982); *Ferrell Construction Co. v. Russell Creek Coal Co.*, 645 P.2d 1005, 1007 (Okla.1982). Where no ambiguity exists, intent must be determined from the words used, unless there is fraud, accident, or pure absurdity. *Lindhorst v. Wright*, 616 P.2d 450, 453 (Okl.Ct.App.1980). The district court agreed with BN and PSO that the Agreement was unambiguous. (Unsealed Joint Appendix at 110). We, too, so agree.

 Contracts must be interpreted as to give effect to the intention of the parties at the time of contracting, with the intention of the parties to be determined from the terms of the contract itself. *Provident Life & Accident Insurance Co. v. Ridenour*, 838 P.2d 530, 531 (Okl.Ct.App.1992); *Mercury Investment Company v. F.W. Woolworth Co.*, 706 P.2d 523, 529 (Okla.1985). Contracts are to be construed with each clause helping to interpret other clauses. *Shepherd v. French*, 612 P.2d 727, 729 (Okl.Ct.App.1980). Courts are bound to give effect to every part of a contract if reasonably practicable. *Dooley v. Cordes*, 434 P.2d 289, 294 (Okla.1967). "Particular clauses of [an Oklahoma] contract, though persuasive in isolation, are not deemed controlling when violative of the general intent of the parties expressed in the contract as a whole." *United States v. H.G. Cozad Construction Company*, 324 F.2d 617, 619 (10th Cir.1963). The intention of the parties to a contract must be deduced from the four corners of the instrument. *McEvoy v. First Nat. Bank and Trust Co.*, 624 P.2d 559 (Okl.App.1980). One covenant implicit in every Oklahoma contract is the agreement that neither party will intentionally do anything to injure the other party's right to the fruits of the contract. *Bonner v. Oklahoma Rock Corporation*, 863 P.2d 1176, 1184 n. 46 (Okla.1993).

Applying these standards to the Agreement, we hold that the district court erred in granting PSO's motions for partial summary judgment.

### Section 5.1

 We agree with BN that the district court erred in ignoring PSO's commitment under § 5.1 to ship a minimum of 2,600,000 tons of coal with BN for each year of the Agreement.

 As set forth, *supra*, the district court did not address PSO's commitment under § 5.1 at the time it granted PSO's motions for partial summary judgment, concentrating instead on § 10. This, notwithstanding that courts are bound to give effect to every part of a contract if reasonably practicable, *Dooley*, 434 P.2d at 294, and that "[p]articular clauses of a contract [such as § 10], though persuasive in isolation, are not deemed controlling when violative of the general intent of the parties expressed in the contract as a whole." *H.G. Cozad Construction Company*, 324 F.2d at 619.

Our review of the Agreement establishes that PSO's commitment to tender or to cause to be tendered a minimum of 2,600,000 tons of coal annually for transportation by BN is, when considered with the rate provisions, the single most important provision of the Agreement. Even though either BN or PSO could request renegotiation of BN's rates if they "believe[d] that the intentions of the parties ... had not been effectuated," (Joint Appendix at 0195), the Agreement required PSO to ship a minimum of 2,600,000 tons of coal via BN each year of the Agreement.

Moreover, numerous provisions within the Agreement were specifically predicated on PSO's commitment to ship a minimum of 2,600,000 tons annually via BN, e.g.: PSO agreed to provide BN with written notice by October of each year "of the forecast volume of coal to be tendered for transportation during each quarter of the next calendar year, subject to the requirements of Section 5.1," (Joint Appendix at 0170); BN's "Base Rate ... and charges for service provided hereunder are predicated on Utility tendering for transportation no less than such minimum annual volume requirement," *id.* at 0193–94; PSO could terminate the contract at any time at its "sole and absolute discretion" by paying BN "an amount equal to thirty percent (30%) of the Effective Rate ... multiplied by the minimum annual volume requirement as described in Section 5," *id.* at 205; in the event that PSO commenced shipping beneficiated coal (which would require less tonnage to achieve the same Btu value required by PSO), it is "understood and agreed that [PSO's] minimum volume re-quirement as set forth in Subsection 5.1 ... [would] not be reduced." *Id.* at 0213.

Under these circumstances, we hold that the court erred in ignoring PSO's commitment under § 5.1 to ship a minimum of 2,600,000 tons of coal annually via BN when it granted PSO's motions for partial summary judgment.

### *Section 10*

#### a.

 We agree with BN that the district court erred in concluding that § 10 constituted an alternative performance provision which allowed PSO to unilaterally reduce its commitment under § 5.1 to ship a minimum of 2,600,000 tons of coal annually and pay liquidated damages, in lieu.

Section 10 provides that "[i]n the event [PSO] fails to tender to BN for transportation the agreed to minimum annual volume requirement ... [PSO] agrees to pay the following sum to BN as liquidated damages." The court concluded that § 10 was an alternative performance provision whereby PSO could unilaterally reduce its minimum tonnage commitment and pay liquidated damages.

 However, a contract with a liquidated damages provision is not an alternative contract. 5 A. Corbin, *Corbin on Contracts* § 1082, at 462 (1964). "Where a contractor promises to render a certain performance or, in default thereof, to pay a definite sum as liquidated damages, he has not made an alternative contract." *Id.*

The difference between alternative performance and liquidated damages is lucidly explained in § 1082 of *Corbin on Contracts*:

> It is evident that some alternative contracts giving the power of choice between the alternatives to the promissor can easily be confused with contracts that provide for the payment of liquidated damages in case of breach, provided that one of the alternatives is the payment of a sum of money.... If, upon a proper interpretation of the contract, it is found that the parties have agreed that either one of the two alter-

native performances is to be given by the promissor and received by the promissee as the agreed exchange and equivalent for the return performance rendered by the promisee, the contract is a true alternative contract.

*Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 689 (10th Cir.1991) (quoting Corbin § 1082, at 463–64).

PSO's commitment to ship 2,600,000 tons of coal annually via BN was not set forth in the Agreement as "one of the two alternative performances ... to be given" by PSO. We hold that the court erred in concluding that § 10 constituted an alternative performance contract.

b.

 We also agree with BN that the district court erred in interpreting the meaning of the word "fails" as it is used in § 10. Words used in a contract are to be understood in their ordinary and proper sense. *Martin v. Harper,* 208 Okla. 303, 255 P.2d 943 (1953).

Section 10 provides that "[i]n the event Utility fails to tender to BN for transportation the agreed to minimum annual volume requirement.... Utility agrees to pay ... liquidated damages." In granting PSO's motions for partial summary judgment, the district court found that:

> the term "fail", as it appears in § 10 is a term of result, not of intent; therefore the court declines to infer that "fail" in § 10 means "unintentionally fail."

(Unsealed Joint Appendix at 114). We hold that the court erred in this finding.

Black's Law Dictionary 712 (6th ed. 1991) defines "fail" as:

> Fault, negligence, or refusal. Fall short; be unsuccessful or deficient. Fading health. *See* Extremis.
>
> Fail also means: involuntarily to fall short of success or the attainment of one's purpose; to become insolvent and unable to meet one's obligations as they mature; to become or be found deficient or wanting; to keep or cease from an appointed, proper, expected, or required action.

Black's Law Dictionary 1304 (6th ed. 1991) defines "require" as:

> To direct, order, demand, instruct, command, claim, compel, request, need, exact.... To ask for authoritatively or imperatively....

Applying these definitions, we hold that "fails," as used in § 10 of the Agreement, means "involuntarily to fall short of success or the attainment of one's purpose," or to "unintentionally fail" to "tender or cause to be tendered" the "minimum annual volume requirement as may be required under this Agreement during each calendar year of the Agreement." Any other interpretation would be in derogation of the Agreement and would contravene established Oklahoma law that "[a]t least one covenant is always implicit in every contract—the agreement that neither party will intentionally do anything to injure the other party's right to the fruits of the contract." *Bonner,* 863 P.2d at 1184 n. 46.

III.

BN contends that if we determine that the Agreement is ambiguous, we may consider record evidence confirming that the district court erred in adopting PSO's construction of the Agreement. This contention is mooted by our holding that the Agreement is unambiguous.

IV.

 BN contends that the district court erred in disregarding the plain language of the third paragraph of § 5.1 which guarantees it a final opportunity to transport PSO's coal in excess of 2,600,000 tons a year. Paragraph 3. of § 5.1 provides in part:

> In the event tonnage in excess of 2.6 million tons per year is to be shipped from the Powder River Basin in Wyoming to Destination and Utility has received a quotation of a lower rate than the Effective Rate under this Contract, Utility, in so far as it is able, must give BN the price terms of the competitor's written quotation ... without disclosing the identity of the competitor or terms other than those affecting price ... and Utility shall give BN the

final opportunity to meet such competitive rate on such tonnage in order to prevent diversion.

(Joint Appendix at 0168–69).

In its motion for partial summary judgment filed May 6, 1993, PSO requested that the court determine as a matter of law that it was not "not required to disclose to [BN] the price terms of a competing carrier's bid to haul PSO tonnage between 2.6 and 3.6 million tons per year, when the bid from the competing carrier has been submitted on the condition that it be kept confidential." (Joint Appendix at 0735). PSO argued that because the competing carrier had requested that its bid be kept confidential, and because it was obligated to disclose such bids under § 5.1 only "in so far as it is able," it was not required to disclose the bid.

The court accepted these arguments and granted PSO's motion for partial summary judgment on its interpretation of § 5.1 without comment.

BN contends that: if PSO is "not able" to disclose the price term of a competitor's written quotation, it must ship any incremental tons via BN; the district court's ruling impermissibly reads out of the Agreement BN's final opportunity to match a competitor's rates; and record evidence of the parties' intent and course of dealing demonstrates that the district court erroneously interpreted § 5.1.

We hold that the district court did not err in granting PSO's motion for partial summary judgment on its interpretation of the third paragraph of § 5.1. Under that paragraph, PSO was, "in so far as it is able," required to provide BN with the price terms of the competitor's written quotation. PSO, having received a confidential bid from a competing carrier, was not able to provide BN with the price terms of the competitor's written quotation.

**REVERSED** in part, **AFFIRMED** in part, and **REMANDED** for further proceedings consistent herewith.