**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 6 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SINCLAIR OIL CORPORATION, a
Wyoming corporation,

Plaintiff - Appellant,

v.

TEXACO, INC., a Delaware
corporation,

Defendant - Appellee.

No. 03-5116

(N.D. Oklahoma)

(D.C. No. 01-CV-642-P)

---

**ORDER AND JUDGMENT** *

---

Before **EBEL** , **ANDERSON** , and **McCONNELL** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Sinclair Oil Corp. appeals from the grant of summary judgment to Texaco, Inc. on Sinclair's claim that Texaco should indemnify Sinclair for costs incurred as a result of a lawsuit brought against Sinclair by a third party who was injured by exposure to material on property which Sinclair had purchased from Texaco. The district court rejected Sinclair's claims for indemnity both under the terms of the purchase agreement by which Sinclair purchased the property from Texaco and under Oklahoma's common law. We affirm.

## BACKGROUND

Texaco commenced operation of the West Tulsa Refinery Complex in the 1920s. In 1977, it leased a portion of the Refinery property (the "Leased Property") to the Tulsa River Parks Authority (the "City"). Sinclair purchased the Refinery, including the Leased Property, from Texaco in July 1983, as documented by a Purchase Agreement. Following the purchase by Sinclair, the City retained exclusive possession of the Leased Property.

In 1991, the City needed to install an expanded sewer system, which necessitated digging a trench across the Leased Property. In September 1991, while excavating the trench across the Leased Property, workers discovered drums containing a black material. The City hired an environmental consulting company to supervise the removal and disposal of the drummed material. Gary Medlin was

an employee of the environmental consulting company. During the removal of the drums, Medlin was exposed to the material in the drums and suffered respiratory injuries.

In May 1993, Medlin and his wife sued Sinclair, Texaco and others in Oklahoma state court, seeking actual and punitive damages for the injuries Medlin received while removing the drummed material from the Leased Property. Texaco moved for summary judgment in the Medlin lawsuit, on the ground that it was a former, as opposed to current, owner of the Leased Property and therefore owed no duty to Medlin, an invitee on the Property. On June 18, 1997, the trial judge in the Medlin lawsuit granted Texaco's motion for summary judgment on the ground that Texaco owed no duty to Medlin. That decision was affirmed on appeal by the Oklahoma Court of Appeals. In June 2000, Sinclair settled the Medlins' claims by paying them $449,500. Sinclair had also incurred attorneys' fees and costs of $228,130.

On August 29, 2001, Sinclair commenced this diversity action against Texaco, claiming, inter alia, that Texaco breached the Purchase Agreement when it refused to indemnify Sinclair for damages incurred by Sinclair in the Medlin lawsuit, and that it had also breached common law, non-contractual obligations to indemnify Sinclair. Texaco filed motions for partial summary judgment, arguing that Sinclair's common law indemnity claim failed as a matter of law because

"undisputed facts demonstrate that Sinclair's alleged liability in the Medlin litigation was not based upon vicarious liability" as required under Oklahoma law and that the terms of the Purchase Agreement did not obligate Texaco to indemnify Sinclair. Appellant's App. Vol. I at 27. The district court granted Texaco's motions, entering judgment in favor of Texaco and dismissing the case. Sinclair appeals.

## DISCUSSION

Sinclair seeks indemnity from Texaco both under the terms of the Purchase Agreement and under Oklahoma common law. Certain provisions of the Purchase Agreement are critical to an analysis of Sinclair's claim based upon contractual indemnity. Section 3.2 provides in pertinent part:

> Texaco to Indemnify Sinclair . Except as otherwise provided in this Agreement, Texaco shall indemnify Sinclair with respect to the consequences of actions that Texaco took, or failed to take, as the owner or operator of the West Tulsa Refinery Complex, at any time prior to the date of closing of this sale to Sinclair. This section shall not apply to matters covered by the Oklahoma Workmen's Compensation Act.

Id. at 82. Section 3.1(b) of the Agreement defines "indemnify" as:

> [t]o pay, perform, discharge, defend, indemnify and hold harmless that party, its officers, directors, employe[e]s and agents, from and against claims, liabilities (including claims for civil penalties to the extent that such claims are legally indemnifiable), obligations, losses and expenses (including reasonable attorney's fees) arising from the

-4-

matter specified, and regardless of whether the indemnified party was negligent in connection with such matter.

Id. at 81.  Section 3.1(d) of the Agreement also provides for "hazardous exposure claims," defined as:

one based on the injury, sickness, disease or death of any person, including any employe[e] of either Texaco or Sinclair, as a result of that person's exposure to any chemical, emission, material, process or condition generated or existing at the West Tulsa Refinery Complex.

Id. at 81-82.  Section 3.6 of the Agreement provides for the sharing of liability for such "hazardous exposure claims" as follows:

3.6  Hazardous Exposure Claims   .  As between Texaco and Sinclair, with respect to any hazardous exposure claim or suit based on the exposure of any person which occurred both before and after the date of closing, (i) Texaco shall bear responsibility to the degree represented by a fraction, the numerator of which is the number of days such person was exposed before the date of closing, and the denominator of which is the number of days such person was exposed both before and after the date of closing, and (ii) Sinclair shall bear responsibility to the degree represented by a fraction, the numerator of which is the number of days such person was exposed after the date of closing, and the denominator of which is the number of days such person was exposed both before and after the date of closing. Texaco shall indemnify Sinclair with respect to hazardous exposure claims and suits to the degree that Texaco bears responsibility under this section, except that Texaco shall not be required to indemnify Sinclair with respect to the fees and expenses of Sinclair's attorneys. Sinclair shall indemnify Texaco with respect to hazardous exposure claims and suits to the degree that Sinclair bears responsibility under this section, except that Sinclair shall not be required to indemnify Texaco with respect to the fees and expenses of Texaco's attorneys. This section shall not apply to matters covered by the Oklahoma Workmen's Compensation Act.  As to those matters to which this

section applies, this section rather than section 3.2, 3.3, 3.4 or 3.5 shall be controlling.

Id. at 83-84.

The district court rejected Sinclair's non-contractual or common law indemnity claim, holding that Oklahoma law requires a legal relationship between the parties, and Sinclair and Texaco do not have the kind of relationship necessary for indemnity to be implied. The court then held that the Medlins' claim was clearly from a "hazardous exposure" and therefore covered by Section 3.6. Since Medlin's exposure occurred totally post-purchase, the formula contained in the Section resulted in 0% liability for Texaco. The court further held that, even if Section 3.6 did not govern the Medlins' claim, Sinclair could not prevail under the general indemnity provisions of Section 3.2 either because:

> Pursuant to Paragraph 3.2 of the Purchase Agreement, Texaco agreed to indemnify Sinclair "with respect to the consequences of actions that Texaco took, or failed to take" while it owned and operated the WTRC. Thus, Texaco agreed to hold Sinclair harmless as to any act of negligence while the WTRC was under its control. However, the state court specifically determined in the action brought by Medlin that Texaco could not be held negligent as a matter of law because it owed no duty to Medlin. This decision was appealed, affirmed and is final. Under the principle of res judicata, parties are barred "from relitigating not only the adjudicated claim but also any theories or issues that were actually decided or could have been decided in that action." Wilson v. Kane, 852 P.2d 717, 722 (Okla. 1993). As a result, "once a court has decided an issue of fact or law necessary to its judgment, that issue may not be relitigated between the same parties or their privies in a different cause of action." Id. at n.23.
> Under the plain language of the indemnity clause to the Purchase Agreement, Texaco must have committed a negligent act

before it may be held liable for indemnity to Sinclair. An adjudication by a court of competent jurisdiction has determined that Texaco was not negligent since no duty was owed to Medlin and, therefore, Sinclair may not recover on its claim for contractual indemnity under the theory of indemnity.

Order at 11-12, Appellant's App. Vol. 2 at 569-70. Finally, the court found that there were disputed issues of fact as to whether Sinclair's failure to tender its defense of the Medlin lawsuit precluded it from seeking contractual indemnification.

Sinclair appeals, arguing the district court erred in (1) applying Section 3.6 to this case; (2) barring Sinclair's contractual indemnification right under Section 3.2 on the ground of res judicata based on the state court's finding in the Medlin lawsuit that Texaco owed no duty to Medlin; (3) requiring negligent acts by Texaco before Section 3.2 applies; (4) construing Section 3.2 on the basis of Texaco's liability to Medlin rather than Sinclair's liability to Medlin; (5) dismissing Sinclair's contractual indemnity claim on summary judgment; (6) holding that a claim for non-contractual or implied indemnity under Oklahoma law requires a special or legal relationship between indemnitor and indemnitee; (7) holding that Texaco and Sinclair did not have such a special or legal relationship; and (8) dismissing Sinclair's implied indemnity claim on summary judgment.

We review the district court's grant of summary judgment de novo.

Allstate Ins. Co. v. Murray Motor Imports Co., 357 F.3d 1135, 1138 (10th Cir. 2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the evidence in the light most favorable to the non-moving party. Allstate Ins. Co., 357 F.3d at 1138. Because this is a diversity case, Oklahoma law governs the construction of the Purchase Agreement and the parameters of any common law indemnity claim.

## I. Contractual Indemnity Claim

The district court held as a matter of law that Sinclair was not entitled to indemnity from Texaco under the Purchase Agreement because the Medlins' damages resulted from a "hazardous exposure" to which Section 3.6 of the Agreement applied and assessed Texaco's liability as 0%. Sinclair argues the court erred because Section 3.6 must be construed narrowly to only encompass hazardous exposure claims involving exposure both before and after the sale of the property from Texaco to Sinclair. Because Medlin's exposure did not straddle

-8-

the sale, Sinclair argues that Section 3.6 is inapplicable and the broad indemnity provision of Section 3.2 obligates Texaco to indemnify Sinclair.

We apply principles of Oklahoma law concerning the interpretation of a contract.

> A contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context. The language in a contract is given its plain and ordinary meaning unless some technical term is used in a manner meant to convey a specific technical concept. The court must interpret a contract so as to give effect to the intent of the parties at the time the contract was formed.

Mercury Inv. Co. v. F.W. Woolworth Co., 706 P.2d 523, 529 (Okla. 1985) (footnotes omitted); see also Kerr-McGee Corp. v. Admiral Ins. Co., 905 P.2d 760, 762 (Okla. 1995); Okla. Stat. tit. 15, § 157 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."). "Whether a contract is ambiguous . . . is a matter of law for the court to resolve." Campbell v. Indep. Sch. Dist. No. 01, 77 P.3d 1034, 1039 (Okla. 2003). Finally, "[w]here no ambiguity exists, intent must be determined from the words used, unless there is fraud, accident, or pure absurdity." Public Serv. Co. v. Burlington N. R.R. Co., 53 F.3d 1090, 1097 (10th Cir. 1995) (applying Oklahoma law); see also Okla. Stat. tit. 15, § 154 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

Considering the Purchase Agreement as a whole, we affirm the district court's conclusion that Section 3.6 governs any indemnity obligation for costs incurred by Sinclair as a result of the Medlin lawsuit. Further, we conclude that the district court correctly held that Texaco's indemnity obligation to Sinclair under that Section is zero.

Section 3.6 is part of Article III of the Agreement, titled SHARING OF LIABILITIES .[1] Article III includes definitions for the terms "indemnify," "environmental incident," and "hazardous exposure." It provides two broad indemnity sections, one pursuant to which Texaco agrees to "indemnify Sinclair with respect to the consequences of actions that Texaco took, or failed to take, as the owner or operator of the [Refinery], at any time prior to" the sale of the property to Sinclair (Section 3.2), and one pursuant to which Sinclair makes a reciprocal agreement to "indemnify Texaco with respect to the consequences of actions that Sinclair takes or fails to take, as the owner or operator of the [Refinery], at any time from and after" the sale of the property to Sinclair (Section 3.3). Appellant's App. Vol. I at 82.

---

[1]Section 8.14 of the Agreement specifically states that "[t]he article and section headings contained in this Agreement are for reference purposes only and shall not effect [sic] in any way the meaning or interpretation of this Agreement." Appellant's App. Vol. I at 122. We accordingly give no added weight to, nor do we attribute any particular meaning to, the headings contained in the Agreement, other than as simply words or phrases which are a part of the Agreement.

In addition to these two broad reciprocal indemnity provisions, Article III contains three narrower sections, each addressing indemnity for a particular type of liability. Section 3.4 addresses "environmental incident claims," [2] Section 3.5 addresses "underground petroleum claims" and Section 3.6 addresses "hazardous exposure claims." Sections 3.4 and 3.5 are similar, indeed parallel, in certain respects.

Under Section 3.4, Sinclair agrees to indemnify Texaco for claims "based on any environmental incident which has occurred, is occurring or may occur in connection with any of those matters referred to in sections 5.1, 5.2, 5.3, 5.4, and 5.5 of this Agreement, regardless of whether or not such environmental incident was caused by Texaco's negligence." Id. at 82. Sections 5.1 through 5.5, in turn, address various known materials buried underground at various locations on the Refinery premises. [3] With respect to these known buried materials, Sinclair agrees

_____

[2]An "environmental incident" is defined as:

> any release (whether directly or indirectly, sudden or not sudden, accidental or not accidental) of any substance into the environment which has the potential to do environmental harm, and includes, without limitation, all releases, contamination and/or pollution to the ground, ground water and/or surface water, and also includes any spilling, pouring, leaking, seeping or any like occurrence into or under the ground, or into any surface or underground water.

Paragraph 3.1(c), Appellant's App. Vol. I at 81.

[3]These sections address sludge in petroleum storage tanks (section 5.1),
(continued...)

-11-

to accept responsibility for them and for any continuing obligations with respect to them, following its purchase of the property from Texaco. Section 3.4 also specifically states that "[a]s to those matters to which this section applies, this section rather than section 3.2 or 3.3 shall be controlling." Id. at 83.

Section 3.5 similarly provides that "Sinclair shall indemnify Texaco with respect to any claim or suit based on any environmental incident which has occurred, is occurring or may occur in connection with any of those matters referred to in section 5.6 of this Agreement, regardless of whether or not such environmental incident was caused by Texaco's negligence." Id. Section 5.6, in turn, states Sinclair's acknowledgment of the existence of "substantial quantities of petroleum" on the Refinery premises. Id. at 99. Under Section 3.5, Sinclair assumes complete responsibility for and agrees to indemnify Texaco for any claims or liability in connection with the underground petroleum. Further, as with sections 3.4 and 3.6, Section 3.5 explicitly states that it (section 3.5) applies rather than sections 3.2 or 3.3 "[a]s to those matters to which this section applies." Id. at 83.

---

[3](...continued)
buried sludge in sites near petroleum storage tanks (section 5.2), a lead pit (section 5.3), active hazardous waste disposal sites (section 5.4), and five active hazardous waste storage sites (section 5.5).

Section 3.4 and 3.5, when read together and in the context of Article III as a whole, indicate that the parties intended that all indemnity questions arising out of any and all "environmental incidents" stemming from underground petroleum or any of the buried materials referred to in Sections 5.1 through 5.5 be resolved under Section 3.4 (buried materials/environmental incident claims) and Section 3.5 (underground petroleum/environmental incident claims), and not under the broader indemnity provision of Section 3.2. Section 3.4 and 3.5 specifically state that as to "those matters" to which each section applies (buried materials environmental incident claims in Section 3.4 and underground petroleum environmental incident claims in Section 3.5) Section 3.2 has no applicability. We must decide if Section 3.6 should be similarly interpreted to apply to all hazardous exposure claims, or only to some such claims while others are addressed by Section 3.2. We hold that it should be interpreted to apply to all hazardous exposure claims.

We examine the language of the Section, bearing in mind that "each clause help[s] to interpret the others." Okla. Stat. tit. 15, § 157. The first sentence of Section 3.6 states that it applies to "any hazardous exposure claim or suit based on the exposure of any person which occurred both before and after the date of closing." Appellant's App. Vol. I at 83. Read in isolation, that sentence appears at first to be ambiguous. It could be read, as Sinclair urges us, to apply only to

exposures occurring both before and after the sale from Texaco to Sinclair. However, it could also be read to apply to "any" hazardous exposure claims, both to those occurring before and to those occurring after the date of closing, as well as to exposures occurring pre- and post-closing. The remainder of the Agreement convinces us that the parties intended the phrase to be read more broadly than Sinclair does. Indeed, except for that one part of that one sentence, nothing else in the structure or language of the Agreement suggests that the parties intended to define "hazardous exposure claims" narrowly.

First, the definition of "hazardous exposure claims" in Section 3.1(d) does not limit the time frame for such exposures. It specifically contemplates hazardous exposures of an "employe[e] . . . of Sinclair," although it is unlikely that a Sinclair employee would be the victim of a straddle exposure. Further, the second part of the first sentence provides that each party (Sinclair and Texaco) "shall bear responsibility to the degree represented by a fraction" calculated in terms of the number of days the hazardous exposure occurred before and after the date of the closing of the sale between Texaco and Sinclair. That formula contemplates, and certainly does not eliminate, exposures which do not straddle the sale date. Rather, the formula simply makes clear that liability for hazardous exposures follows ownership of the Refinery property.

-14-

Moreover, the second sentence of Section 3.6 states that "Texaco shall indemnify Sinclair with respect to hazardous exposure claims and suits to the degree that Texaco bears responsibility under this section." Texaco's "responsibility" is, as indicated, calculated using the formula provided in Section 3.6, which assesses responsibility according to how much of the hazardous exposure occurs during Texaco's ownership of the property. Thus, as applied to the Medlin exposure, Texaco's responsibility to Sinclair is zero, because the exposure occurred completely post-closing.

Additionally, Section 3.6, like Sections 3.4 and 3.5, expressly states that it applies "rather than section 3.2" "[a]s to those matters to which this section applies." An entirely reasonable reading of "those matters," in the context of Texaco's indemnity obligations, would be "hazardous exposure claims and suits to the degree that Texaco bears responsibility under this section." As to those claims, Section 3.2 has no applicability. Section 3.2's statement of Texaco's broad indemnity obligation is irrelevant where Texaco's "responsibility" for a hazardous exposure claim has been calculated under Section 3.6.

Finally, Sinclair's narrow interpretation of Section 3.6 as applying only to straddle exposures could lead to absurd results, or certainly results not likely to have been intended by the parties. If, for example, someone was exposed to a hazardous substance on the Refinery premises for some period of time both prior

to and following the sale of the Refinery from Texaco to Sinclair, Texaco's share of liability under Section 3.6 would diminish, and Sinclair's would increase, in accordance to what proportion of the exposure occurred both pre- and post- sale. But if the entire exposure occurs post-closing, Sinclair would assert that Section 3.6 has no applicability, and that Section 3.2 imposes 100% liability upon Texaco. Thus, Texaco would incur diminishing liability for certain exposures, as a diminishing proportion of those exposures occurred pre-sale, during the time when Texaco still owned and controlled the property. But Texaco would incur complete liability for entirely post-sale exposures, *none* of which occurred while it still owned and controlled the property. That is the kind of absurdity which we must avoid when interpreting this Agreement.

We therefore conclude that the reasonable, rational interpretation of Section 3.6 is that it applies to all hazardous exposure claims, whether they occur entirely pre-closing, entirely post-closing or straddle the closing date. Application of the formula contained in the Section apportions liability in accordance with ownership of the premises upon which the exposure occurred. Accordingly, the district court correctly applied Section 3.6 to determine Texaco's indemnity obligation to Sinclair for damages incurred as a result of the Medlin lawsuit, and it correctly determined that Texaco was not obligated to indemnify Sinclair at all. Because we have held that Section 3.6 exclusively determines indemnity

obligations for hazardous exposure claims like the Medlins' claim, we do not address the propriety of the district court's application of Section 3.2 to this case.

## II. Non-Contractual Indemnity Claim

Sinclair argues that, separate from any contractual indemnity under the Purchase Agreement, Texaco is obligated to indemnify it under principles of Oklahoma common law. The district court rejected this argument, holding that Oklahoma law requires the existence of a legal relationship between the parties. Sinclair concedes that certain cases decided by the Oklahoma Supreme Court do contain language expressing the necessity for such a relationship, but it argues that other cases are not so clear such that "Oklahoma law is inconsistent with respect to whether a legal or special relationship between indemnitor and indemnitee is a prerequisite for a common law indemnity claim." Sinclair's Reply Br. at 14 n.8. We disagree.

In National Union Fire Ins. Co. v. A.A.R. Western Skyways, Inc., 784 P.2d 52 (Okla. 1989), the Oklahoma Supreme Court expressly stated that "Oklahoma case law has always premised this [non-contractual] right of indemnity on the understanding that a legal relationship exists between the parties." Id. at 54; see also Woolard v. JLG Indus., Inc., 210 F.3d 1158, 1178 (10th Cir. 2000) (noting that under Oklahoma law "[n]oncontractual or equitable indemnity may arise from

-17-

a legal relationship between the parties" (internal quotation marks omitted)); Daugherty v. Farmers Coop. Ass'n, 790 P.2d 1118, 1120 (Okla. Ct. App. 1989) ("A right to implied indemnity may arise out of a contractual or a special relationship between parties and from equitable considerations."); Cent. Nat'l Bank of Poteau v. McDaniel, 734 P.2d 1314, 1316 (Okla. Ct. App. 1986) (same). Sinclair asserts that Porter v. Norton-Stuart Pontiac-Cadillac of Enid, 405 P.2d 109 (Okla. 1965), found an implied obligation to indemnify in the absence of a special or legal relationship between the indemnitor and the indemnitee. We disagree. Porter involved a respondeat superior relationship, as subsequent Oklahoma courts have indicated. See Burke v. Webb Boats, Inc., 37 P.3d 811, 814 (Okla. 2001) (citing Porter for the proposition that "[a] master is entitled to indemnity from the servant where the negligence of the servant causes damage to a plaintiff but no fault is attributable to the master"); Nat'l Union Fire Ins. Co., 784 P.2d at 55 (describing Porter as "decided within the context of the rule of respondeat superior").

Sinclair argues that, even if a legal or special relationship is required before an implied right to indemnification arises, Texaco and Sinclair have such a relationship by virtue of the Purchase Agreement. We again disagree. The seller and buyer of real property do not, by virtue of that status alone, have the kind of legal or special relationship Oklahoma courts have required for implied indemnity

to exist.  Sinclair's claim that Texaco is impliedly obligated to indemnify it for losses incurred by virtue of the Medlin lawsuit accordingly fails.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to Texaco is AFFIRMED.  We deny any pending motions.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

03-5116, <u>Sinclair Oil v. Texaco, Inc.</u>
**EBEL,** Circuit Judge, dissenting.


I must respectfully dissent. It is my judgment that paragraph 3.2 of the Purchase Agreement prevails. I believe that paragraph 3.6 was a special purpose paragraph drafted only to cover a specific situation that the parties had in mind when a hazardous substance exposure "occurred <u>both</u> before and after the date of closing." (Emphasis added.) I see nothing absurd in applying paragraph 3.6 to that specific situation, while applying the more general indemnity provision of paragraph 3.2 to all other claims, such as the claim before us.

Further, I do not believe that paragraph 3.2 is limited only to situations involving Texaco's negligence. To the contrary, paragraph 3.2, by its own words, applies more broadly to " <u>actions</u> that Texaco took, or failed to take" (emphasis added), rather than simply to negligent actions.

Because I believe that paragraph 3.2 of the Purchase Agreement explicitly covers this situation, I do not believe that Texaco can rely on any implied indemnification under Oklahoma's common law.

For these reasons, I would reverse and remand for further proceedings.